731 A.2d 1245 (1998)
323 N.J. Super. 89
Joyce GAITA, Plaintiff,
v.
The LAUREL GROVE CEMETERY COMPANY, a New Jersey Corporation trading as Laurel Grove Cemetery, Richard Roe and Entities 1-5, Defendants.
Superior Court of New Jersey, Law Division, Passaic County.
Argued May 1, 1998.
Decided June 11, 1998.
*1246 Alfred E. Fontanella, Totowa, for plaintiff (Fontanella & Benevento, attorneys).
Jane Garrity Glass, Montclair, for defendants (Garrity, Graham, Favetta & Flinn, attorneys).
REISNER, J.S.C.
This case raises the novel issue of the potential liability of a cemetery for an attack by a third party upon a visitor to the cemetery. Research reveals no reported decisions from this or any other jurisdiction on this issue. Defendant Laurel Grove Cemetery has filed a motion for summary judgment on the grounds that the rule of liability most recently articulated in Clohesy v. Food Circus Supermarkets, 149 N.J. 496, 694 A.2d 1017 (1997), should not be applied to cemeteries or, if the rule applies, the plaintiff has not satisfied the criteria set forth in Clohesy for establishing a duty to provide security.
For the reasons set forth below, the court holds that a cemetery is subject to the rule set forth in Clohesy, that is, a cemetery has no special immunity or exemption from the general duty of a business to protect invitees against assaults by third parties if, under the totality of the circumstances, such attacks are foreseeable. The court also holds that under the totality of the circumstances of this case, as established by the undisputed facts presented to the court on this motion, defendant Laurel Grove Cemetery had a duty to a visitor such as plaintiff Gaita to provide some amount of security.
Findings of Fact
For purposes of this summary judgment motion, the following facts are undisputed. At about 2:00 in the afternoon on July 15, 1994, Joyce Gaita was visiting the grave of several relatives at Laurel Grove Cemetery ("Laurel Grove" or "the cemetery") in Totowa Borough.[1] The gravesite or family plot was located in a remote area of the cemetery, far from the entrances, not far from a wooded area and bounded by Route 80. Ms. Gaeta was alone. While bending *1247 over the grave, she was attacked, struck on the head, and knocked unconscious. Her purse, jewelry and car were stolen. She sustained serious injuries.
Laurel Grove is located on a 200 acre property. It is bounded by Route 80, Riverview Drive, Totowa Road and Mount Nebo Cemetery. There are two entrances to the cemetery, one on Totowa Road and one at the intersection of Totowa Road and Riverview Drive. In July 1994 there was a 5 to 6 foot high chain link fence around portions of the cemetery; other portions were not fenced. At the time of the incident, the cemetery had no security at all, in the form of guards, cameras or anything else beyond the partial fence. There was a sign about four feet by seven feet at each entrance setting forth various cemetery rules and warning visitors to "Keep cars and valuables locked at all times." There was no warning to visitors as to the complete lack of security within the cemetery and no warning as to the potential danger of going into remote areas of the cemetery alone.
It is undisputed that for the three years prior to the incident, the crime rate in Totowa, while falling slightly, was consistently higher than the state average. Although there were no violent crimes in the cemetery in the five years prior to the incident, in 1983 there had been two rapes in the same area of the cemetery in which plaintiff was attacked. There is no evidence that the cemetery took any steps to provide security after the rapes occurred.
In the five years prior to the assault on Joyce Gaita, there were a number of property crimes in the cemetery, including theft, vandalism, and incidents in which police found evidence of satanic rituals being conducted in the cemetery at night. Three months before the incident there was a theft of a purse from a vehicle. Two and a half weeks before the incident, an armed man was observed vandalizing a gravesite.
Plaintiff also placed before the court on this motion numerous newspaper articles reporting on the rising incidence of crime in cemeteries in the North Jersey area around the time of the incident.
There is a dispute between the parties as to whether the Laurel Grove Cemetery is a "nonprofit" entity or whether it should be considered a profit-making enterprise because some dividends are paid to shareholders. The court considers this dispute immaterial, and for purposes of this motion will assume that the cemetery is a non-profit organization. There is no dispute that the cemetery is actively engaged in the business of selling gravesites, providing burials, cremations, and grave openings for a fee, and selling grave ornaments such as wreaths, flower arrangements, and urns. The cemetery also hosts various events on its premises for a fee.[2] All of these services and products are advertised and promoted to the public. There is no evidence on this record that these services and products could not be priced so as to account for the additional expense of some minimal security for cemetery visitors.
Plaintiff has filed with her motion a report from a security expert detailing the need for security at the cemetery. Plaintiff's expert opines that the cemetery deviated from accepted security standards in various respects, and details the steps that should have been taken to prevent the *1248 attack on the plaintiff. Defendant did not produce an expert report.
Conclusions of Law
It has been established since Lawlor v. Cloverleaf Memorial Park, Inc., 56 N.J. 326, 266 A.2d 569 (1970), that cemetery associations do not have charitable immunity from negligence suits for personal injuries. In rejecting the claim of charitable immunity in Lawlor, the Supreme Court observed that
[T]he grant of the immunity to such cemeteries would, while leaving the injured parties remediless, mainly serve to guard the financial hopes of the original entrepreneurs or their families who, as here, still hold the bonds issued by the Association.

[56 N.J. at 338, 266 A.2d 569]
The concept that a business owner has a duty to protect invitees against physical harm caused by foreseeable acts of third parties, is not new or radical. As the Supreme Court noted in Butler v. Acme Markets, Inc., 89 N.J. 270, 280, 445 A.2d 1141 (1982), the Restatement (Second) of Torts, § 344 at 223-224 (1965) sets forth this duty:
A possessor of land who holds it open to the public for entry for his business purposes is subject to liability to members of the public while they are upon the land for such a purpose, for physical harm caused by the... intentionally harmful acts of third persons... and by the failure of the possessor to exercise reasonable care to (a) discover that such acts are being done or are likely to be done, or (b) give a warning adequate to enable the visitors to avoid the harm, or otherwise to protect them against it.
In Butler, the Court held that the Restatement applied to criminal acts committed in supermarket parking lots:
[A] shopkeeper's liability under these circumstances is properly based upon familiar negligence concepts. The proprietor of premises to which the public is invited for business purposes of the proprietor owes a duty of reasonable care to those who enter the premises upon that invitation to provide a reasonably safe place to do that which is within the scope of the invitation... Foreseeability of the risk that criminal acts of others would cause harm is the crucial factor.

[89 N.J. at 275, 445 A.2d 1141]
In Butler, the mugging of plaintiff in Acme's parking lot was deemed "apparent" in light of the five muggings which occurred there during the four months before the attack on the plaintiff. Id. at 277, 445 A.2d 1141. The Court held that Acme's duty included a duty to warn patrons of "the recent repeated attacks." In addition, the Court noted that the cost of a private security service could fairly be borne "by the operators and indirectly patrons of such shopping facilities." Id. at 279, 445 A.2d 1141. A jury could conclude that absent warnings to patrons of the danger, the store provided an inadequate security force to protect its patrons. Id. at 280, 445 A.2d 1141.
The principles discussed in Butler were restated and further refined in Clohesy v. Food Circus Supermarkets, 149 N.J. 496, 694 A.2d 1017 (1997). Unlike Butler, where foreseeability of the crime was not an issue, Clohesy focused on foreseeability as it relates to the proprietor's duty to provide security.[3] As further discussed, infra, the one issue which Clohesy did not address, which must be addressed here, is the fairness of imposing the duty on the particular type of business involved in the case. The fairness/policy issue respecting supermarkets was well-established by 1997.
Clohesy involved a carjacking in a supermarket parking lot, and the subsequent murder of the victim. There had been 60 *1249 criminal incidents on or near the Foodtown supermarket premises over the 2 1/2 year period prior to the carjacking, although there were no prior similar crimes on the premises. The configuration of the store and the lot were such that the area of the lot where the victim was parked was not visible from inside the store. There were no security guards in the parking lot, no surveillance cameras, and no warning signs. Plaintiff provided an expert report which opined that defendant's failure to provide security deviated from industry standards of care and proximately caused plaintiff's death.
After restating the basic principle that "business owners and landlords have a duty to protect patrons and tenants from foreseeable criminal acts of third parties occurring on their premises," id. at 504, 694 A.2d 1017, the Court adopted a "totality of the circumstances" test to determine foreseeability. The totality of the circumstances includes all of the factors a reasonably prudent person would consider. Foreseeability does not depend upon the existence of prior similar criminal incidents on the premises. Criminal incidents in close proximity to the premises should be considered. Moreover, "prior criminal incidents" includes all crimes since property crime can easily escalate into violent crime. Id. at 509, 694 A.2d 1017. The Court also considered the escalating crime rate in the general area; the evidence of the high level of crime in parking lots generally; the lack of passive or active security for the lot, including the lack of visibility; the size and location of the property; the size of the parking lot; the type of business defendant operates; and the nature and circumstances of nearby businesses. Id. at 517, 694 A.2d 1017.
The Court concluded that under all the circumstances, the scope of the duty owed included some security for patrons. While the Court did not hold that security guards were required, the Court noted that a jury could find that an active security system was required to satisfy the supermarket's duty. The Court indicated in passing that the scope of the duty might be different for a small business than for a large supermarket. Id. at 520, 694 A.2d 1017.
Applying the Clohesy "totality of the circumstances" test, this court finds that an attack on a lone woman in the remote area where plaintiff was mugged, was foreseeable, and that defendant Laurel Grove owed plaintiff a duty to provide some measure of security to visitors such as herself.
The court finds that Ms. Gaita was a business invitee of Laurel Grove, because having visitors come to a grave is an expected and inextricably intertwined part of the service of providing the gravesite. Cemeteries do not provide gravesites and burial services in the expectation that the survivors will abandon the sites and never visit them. The opposite is true; in fact Laurel Grove actively promoted the sale of wreaths and other grave ornaments, in the obvious expectation that persons such as plaintiff would visit the grave and want to leave wreaths, flowers and similar items in memory of the deceased. Having visitors is part of the business of operating a cemetery, and the cemetery owes those visitors the duty of care owed a business invitee. This is particularly so where the cemetery is still actively selling grave sites and other products and services.
Proceeding to the totality of the circumstances, the following factors are relevant. The cemetery was located in an area with a crime rate above the statewide average; the cemetery covered a 200 acre site with many areas being remote from the entrance gates and offices; the cemetery was bounded by Route 80 and Riverview Drive, thus facilitating the entry and escape of would-be assailants; the cemetery had no security; there was an increasing level of crime in cemeteries generally in the North Jersey area; the past history of rapes in the remote area of the cemetery where *1250 plaintiff was attacked; and the prior other crimes in the cemetery.
In two separate incidents in 1983, cemetery visitors were raped in the same secluded area of defendant's cemetery where Joyce Gaita was later mugged. While remote in time from the mugging, the rapes certainly should have put the cemetery on notice of the need for some type of security for visitors, if only a clear warning to avoid going alone into remote areas of the cemetery. There is, however, no evidence that the cemetery provided any security in response to the rapes. By 1994, there were still no security personnel, no warnings of the possibility of physical assault, and no complete fencing around the premises. A jury could certainly find that a warning to lock valuables and cars, included in a list of other cemetery rules, was not adequate to inform patrons of the need to safeguard their own physical safety.
While the other crimes in Laurel Grove, apart from the rapes in 1983, were non-violent property crimes, it is not unusual for property crime to escalate into violent crime. Less than three weeks before plaintiff was mugged, a man armed with a gun was observed vandalizing a grave site at the cemetery. Moreover, the incidents of vandalism and satanic rituals in the cemetery, should have put the owners on notice that there were those in the vicinity who did not respect the sanctity of the cemetery and were willing to invade the premises for unlawful purposes. The newspaper articles concerning the rising incidence of crime in cemeteries are also relevant to what reasonable cemetery owners should have known in 1994 concerning the likelihood of crimes occurring on their premises. Cemeteries may be hallowed ground, but that does not mean that their visitors are safe from those to whom nothing is sacred. Cemeteries have an obligation to recognize and account for that reality in their business practices.
Defendant's reliance on the Supreme Court's reference to "small businesses" in Clohesy, is misplaced. Laurel Grove may be non-profit, but given the scale of its operation and the size of its revenues as reflected in its annual reports, it is not a small business. The cost of some security measures could certainly be built into the price of the graves, services, and products it offers to the public. The fact that cemeteries have a perpetual obligation to provide upkeep of the graves and grounds is relevant; a cemetery which is burdened by high expenses cannot simply shut its doors and go out of business. Nonetheless, cemeteries are required to deposit a portion of their proceeds into a perpetual Maintenance and Preservation Fund which is available for the purpose of upkeep after the cemetery ceases to sell gravesites. It may be that a cemetery which no longer has gravesites to sell will choose to provide security by way of warning signs, while a cemetery which is still actively promoting sales and services will prefer, for commercial reasons, to provide more elaborate security (e.g., guards, surveillance cameras, etc.) rather than advise patrons of its lack of security. See Clohesy, supra, 149 N.J. at 520, 694 A.2d 1017.
The rationale of Bauer v. Harleigh Cemetery Co., 278 N.J.Super., 622, 651 A.2d 1084 (Law Div.1994), which addressed liability for property damage to mausoleums, does not apply to liability for injury to human beings. Our society places a higher value on human life than it does on property. Moreover, the "public policy and concepts of fairness" discussed in Bauer, supra, 278 N.J.Super., at 625-628, 651 A.2d 1084, are not applicable here for other reasons. Mausoleum owners can provide security for their own property, and it is more fair to impose that burden on the relatively few mausoleum owners than it is to impose the cost upon all of those paying for in-ground burials, or upon the cemetery association. On the other hand, all business invitees of the cemetery have an interest in being secure from physical assault. There is, therefore, no injustice in spreading the cost of the cemetery's security and liability insurance *1251 among all those who purchase gravesites, products or services from the cemetery. Moreover, the public interest in protecting human life and safety, as reflected in the Restatement as well as in Butler and Clohesy, supports the application of basic personal injury negligence principles to cemeteries.
Defendant's motion for summary judgment will be denied.
NOTES
[1] The cemetery is open to the public from 8:00 a.m. to 5:00 p.m.
[2] Plaintiff contends that the cemetery's revenues approach $2 million per year, based upon the cemetery's annual reports to the Cemetery Board. Defendant denies that $2 million is the correct figure but its brief does not inform the court as to what the correct figure is. The 1996 report reveals revenues of $332,861 for lot and grave sales, and $427,250 for crypt and niche sales. The report also indicates 967 interments, and 120,249 square inches of base of memorials installed (see N.J.S.A. 8A:4-5 which describes the deposits due the fund). According to its 1998 price list, interments range from $230 to $1,200. Memorials range in price from $150 to $1,500. Even assuming that all interments and memorials were at the lowest prices and assuming some price inflation between 1996 and 1998, revenue in 1996 would have been at least $1 million.
[3] Clohesy differentiated foreseeability as it relates to duty, which is an issue for the Court to decide initially, from foreseeability as it relates to proximate cause, which is a jury question.