835 A.2d 692 (2003)
364 N.J. Super. 301
Karl KUEHN, Plaintiff-Appellant/Cross-Respondent,
v.
PUB ZONE, Defendant-Respondent/Cross-Appellant, and
Maria Kerkoulas, Arm Supply Company, Inc., and Anthony Zois, Defendants.
Superior Court of New Jersey, Appellate Division.
Argued October 8, 2003.
Decided November 24, 2003.
*694 Jeffrey W. Warden, Denville, argued the cause for appellant-cross-respondent (Bongiovanni, Collins & Warden, attorneys; Mr. Warden, on the brief).
Terrence J. Bolan, Shrewsbury, argued the cause for respondent-cross-appellant (Bolan Jahnsen Ball & Reardon, attorneys; Mr. Bolan, on the brief).
Before Judges STERN, PAYNE and KIMMELMAN.
*693 The opinion of the court was delivered by PAYNE, J.A.D.
Plaintiff Karl Kuehn was severely injured when attacked in the men's room of a tavern in the Township of Union known as the Pub Zone by three members of the Pagan motorcycle gang. Following trial, a $300,000 verdict in plaintiff's favor was entered against the Pub Zone. However, the trial judge granted judgment notwithstanding the verdict (JNOV) to it, finding the facts established that no foreseeable danger was posed by the Pagans and that the tavern owed no duty to plaintiff that was breached. Plaintiff has appealed from the JNOV. The Pub Zone has filed a cross-appeal, arguing in the event that the jury's verdict is reinstated that the court committed error in its decisions during trial to bar any claim of comparative negligence on plaintiff's part and to permit testimony by plaintiff's expert. If the JNOV is not sustained, it also seeks a new trial claiming the jury's award of damages to have been so unreasonably high as to shock the *695 judicial conscience. We reverse the trial court's determination to grant a JNOV and deny the relief sought in the Pub Zone's cross appeal.

I.
We view the evidence at trial in the light most favorable to the plaintiff. Dolson v. Anastasia, 55 N.J. 2, 5, 258 A.2d 706, 707-08 (1969). Plaintiff was injured on May 30, 1998 while a patron at the Pub Zone. At the time, Maria Kerkoulas was the Pub Zone's co-owner, having purchased the business with Georgia Tspouras on December 31, 1992. Kerkoulas, who was the only witness offered on the Pub Zone's behalf, was tending the Pub Zone's upstairs bar when plaintiff was attacked. Prior to Kerkoulas's ownership of the bar, it had been taken over as a biker hangout, and frequent incidents had occurred that included destruction of property. During this period, Kerkoulas had served as a bartender. Upon purchasing the establishment, Kerkoulas sought the assistance of the Union police in ridding the bar of its biker clientele. According to Kerkoulas, the police showed her a pamphlet regarding biker gangs, including the Pagans, who were described in it as "a bunch of outlaws." Establishments were warned to be wary of the Pagans, because they were troublemakers and were known to assault people for no reason. In addition to reading the pamphlet, Kerkoulas had knowledge of the Pagans from her conversations at a nearby bar that the Pagans frequented. As a result of those conversations, she felt "negative" about them and knew they were "trouble."
Kerkoulas testified that the Union police advised her to put up a sign stating that persons wearing "colors" (a term meaning gang insignia) were not allowed in the premises. She did so and instructed her doormen to deny entry to persons fitting that description. When asked why she adopted these measures, Kerkoulas testified that if bikers wearing insignia were not present, no disturbances would occur, and people would not get beaten up. Kerkoulas stated that strict enforcement of her policy and calls to the police when insignia-wearing bikers gained entry had eliminated "a lot" of the trouble at the bar, and that the clientele had changed. During her ownership, Rhino, one of plaintiff's attackers whom Kerkoulas knew as a biker but not necessarily as a Pagan, had been present in the Pub Zone while not wearing insignia on one to five occasions without incident. According to plaintiff, approximately six months prior to the attack on him, a group of Pagans wearing colors had been involved in another incident at the Pub Zone with a bar patron in the bar's men's room. Although plaintiff did not observe the attack, he saw the patron exiting the men's room with a red mark on his cheek.
On the night at issue, three bikers including Rhino and a man known as "Backdraft" had pushed past Petey, the doorman, and had entered the Pub Zone wearing their colors. Plaintiff knew Rhino and Backdraft as patrons of a bar called the Homestead that he also frequented. However, he did not know of their gang affiliation and had never seen them wearing colors. Plaintiff testified that he recognized Pagans as part of a "drifter, criminal element," he was "concerned" by their entry, and he stated to Petey that he didn't think their presence was a "great idea." However, after a discussion with plaintiff and Petey, Kerkoulas permitted the three to remain for one drink. It was Kerkoulas' position at trial that plaintiff had been the one to urge that the Pagans be admitted, and that she had relied on plaintiff's assessment in permitting them to remain. She testified *696 that she would have called the police immediately if plaintiff had not vouched for the three bikers.
All agreed that the Pagans consumed one drink without incident and proceeded toward the stairs leading toward the downstairs bar and men's room and toward the exit. Kerkoulas assumed the three were leaving, but did not witness them doing so. In fact, they did not. Instead, they either entered the men's room with plaintiff or followed him there, and shortly thereafter, they viciously attacked him. Plaintiff has no recollection of the attack and no explanation of its motive, unless, he speculates, it was a reaction to plaintiff's attempt to bar them from entering the establishment.
Plaintiff sustained injuries in the attack including loss of consciousness, traumatic subarachnoid brain hemorrhage, a C-5,6 disc herniation with pressure on the spinal cord and radiculopathy, a right orbital fracture, maxillary fractures, and a basilar skull fracture manifesting as the presence of blood behind the tympanic membrane of the ear. He was hospitalized initially from May 30 to June 2, 1998. He underwent two reconstructive surgeries to his eye socket; one during his initial hospitalization and one in December 1998. An anterior cervical disc fusion has been recommended, but declined. Continuing symptoms remain, but are not disabling. In January 1999, plaintiff opened his own bar, where he occasionally entertains by playing the harmonica.
At the time of the attack, approximately 125 to 130 patrons were present in the bar, with approximately 80 patrons participating in classic disco night upstairs and the remainder at the downstairs bar, where a band was playing. The bar had one doorman, Petey, stationed at the front entrance, which was located at the opposite end of the front facade from the exit by which Kerkoulas assumed the Pagans were leaving. There was one bartender in the downstairs bar and two bartenders, including Kerkoulas, upstairs. No other security was present, no training in security techniques had been provided to bar personnel, and no background in security measures was required for employment.
Plaintiff, an avowed motorcycle enthusiast and maker of custom cycles, was a motorcycle owner and frequent participant in motorcycle rallies. He was not a member of any biker gang, and had no reputation for violence, being described by Kerkoulas as quiet and very friendly. There is no claim that plaintiff was intoxicated at the time of the attack or that he provoked it.

II.
In granting JNOV in this case, the trial judge found no duty to protect plaintiff to exist under the circumstances presented. First, the court found that injury to plaintiff was not foreseeable. He framed plaintiff's position in the following terms:
It's argued here that because the assailants were bikers and because they were wearing colors that there was a foreseeability of an attack or an assault.
However, the court reasoned, it was foreseeable that an attack by bikers wearing colors would occur only when a rival gang was present, and none was at the bar on the night in question. The attack was apparently random; not gang-related. Moreover, the court found that the Pagans could have entered the bar without challenge and committed their attack simply by removing their jackets. The court continued:
The element of foreseeability simply does not exist in this case except if one is to conclude that because of the appearance of the bikers or because of their membership in and of itself that *697 that alone imposed a duty ... on the tavern operators to protect the patrons under all circumstances.
The foreseeability would therefore be eliminated from the equation if that were so, and there would be a strict bar against any person entering because they were a member of a particular association or it could be taken further because they looked a particular way because he's bald headed and wears an earring or he had something in his nose or has an appearance that is menacing and threatening. One would be inclined to protect [against] all of these where if nothing else but give any indication at all that the person poses danger or risk to any other person.[1]
The court found further that, unless the bar were under a duty to monitor the conduct of the Pagans at all times while they were on the premises, there was nothing that could have been done to prevent the attack.
It occurred in the bathroom, and without any shouting having preceded it, without any sign of anything other than cordiality having been exhibited, and it simply did not suggest that there was any reason, whatsoever, other than wearing of the colors which would and might be as a matter of law ... imposed a duty to have them monitored every moment that they were in the premises.
Under circumstances in which danger was not foreseeable, the court found that no such duty existed.
[I]n measuring the duty there [has] to be an evaluation of the issues of fairness and the nature of the risk, the relationship of the parties, the opportunity to exercise care and the effect upon the public of the imposition of the duty.... [I]t's a burden that is too onerous to say that bikers with their colors can go nowhere without a commercial operator being under a duty to prevent them from attacking without any provocation any other customer who happened to be on the premises. That's strict liability strict liability that is absolute liability rather than negligence.
The existence or not of a duty of care is a legal issue to be determined by the court. Carvalho v. Toll Bros. & Developers, 143 N.J. 565, 572, 675 A.2d 209, 212 (1996). The scope of any such duty is likewise determined by the court as a matter of law. Kelly v. Gwinnell, 96 N.J. 538, 552, 476 A.2d 1219, 1226 (1984). Whether a duty exists depends upon an evaluation of a number of factors including "The nature of the underlying risk of harm, that is, its foreseeability and severity, the opportunity and ability to exercise care to prevent the harm, the comparative interests of, and the relationships between or among the parties, and, ultimately, based on considerations of public policy and fairness, the societal interest in the proposed solution." J.S. v. R.T.H., 155 N.J. 330, 337, 714 A.2d 924, 928 (1998).
As a preliminary matter, we analyze the question of foreseeability in a fashion different from the trial judge. The trial judge found the attack upon plaintiff did not become foreseeable because the Pagans wore their colors, since colors constituted a signal of aggression only to rival gangs. Further, in the absence of foreseeable injury, he found no duty to avoid the risk of harm to patrons to exist since, once the Pagans had entered, fulfillment of the duty would have required constant monitoring, a requirement that the court found in the circumstances to be unreasonable.
*698 We view the issue of foreseeability as requiring an answer to the following questions: (1) was it foreseeable that Pagans, however dressed, would engage in random acts of violence, and if so, (2) did the fact that the Pagans were wearing identifying colors make it more foreseeable to tavern staff that they, rather than other customers, would attack randomly? In framing the issue this way, we treat the Pagan's colors merely as an identifier that would afford a knowledgeable tavern owner such as Kerkoulas with a means of sorting her clientele, albeit imperfectly (since missing Pagans not wearing colors), into dangerous and non-threatening categories and acting accordingly. We do not associate the wearing of colors with the presence or absence of random violence, since there is no support for that association in the record. There, such violence was connected to the Pagans as a biker gang. It was not necessarily connected to their use of colors.
Foreseeability of harm alone is of course not dispositive of whether a duty to exercise reasonable care to avoid the risk of harm to another exists. Clohesy v. Food Circus Supermarkets, 149 N.J. 496, 502, 694 A.2d 1017, 1020 (1997).
Foreseeability as it impacts duty determinations refers to
"the knowledge of the risk of injury to be apprehended. The risk reasonably to be perceived defines the duty to be obeyed; it is the risk reasonably within the range of apprehension, of injury to another person, that is taken into account in determining the existence of the duty to exercise care."
[Id. at 503, 694 A.2d at 1021 (quoting Hill v. Yaskin, 75 N.J. 139, 144, 380 A.2d 1107, 1109 (1977)) (quoting 57 Am.Jur.2d Negligence § 58 (1970)).]
In this case, Kerkoulas had actual knowledge of a risk of injury from bikers as the result of her experiences as a barkeeper prior to and immediately following her purchase of the Pub Zone. She admitted that she had received additional information regarding the Pagans from a nearby tavern owner and from the Union police. As a result, she understood that they were troublemakers who were known to assault people for no known reason. In Kerkoulas's mind, the foreseeable risk of Pagan violence was sufficient to cause her to place a sign at the entrance to her premises warning that Pagans wearing colors would be barred from entry and to summon the police if unauthorized entry were gained. Our review of the evidence suggests no practical means by which Pagans who were not wearing their colors could have been excluded. However, since the Pagans involved in the attack were wearing colors, we need not address the scope of a duty of care, if any, that would exist if the Pagans were indistinguishable from other patrons.
"Business owners and landlords have a duty to protect patrons and tenants from foreseeable criminal acts of third parties occurring on their premises." Clohesy, supra, 149 N.J. at 504, 694 A.2d at 1021. See also, e.g., Butler v. Acme Markets 89 N.J. 270, 280, 445 A.2d 1141, 1145-46 (1982); Trentacost v. Brussel, 82 N.J. 214, 231, 412 A.2d 436, 445 (1980); Braitman v. Overlook Terrace Corp., 68 N.J. 368, 383, 346 A.2d 76, 84 (1975). As the Court held in Clohesy, foreseeability does not require the existence of prior similar criminal incidents, but depends instead on an evaluation of the totality of the circumstances. Clohesy supra, 149 N.J. at 506-08, 694 A.2d at 1022-24.
In this regard, the Court in both Acme and Clohesy adopted the Restatement (Second) of Torts Section 344, Comment (f) *699 as a standard for determining in cases of injury by third persons "which criminal incidents may give rise to liability." Butler, supra, 89 N.J. at 280, 445 A.2d at 1145-46; Clohesy, supra, 149 N.J. at 506-07, 694 A.2d at 1022-23. Section 344 provides:
A possessor of land who holds it open to the public for entry for his business purposes is subject to liability to members of the public while they are upon the land for such a purpose, for physical harm caused by the accidental, negligent or intentionally harmful acts of third persons or animals, and by the failure of the possessor to exercise reasonable care to
(a) discover that such acts are being done or are likely to be done, or
(b) give a warning adequate to enable the visitors to avoid the harm, or otherwise to protect them against it.
Comment (f) to that Section states:

Duty to police premises. Since the possessor is not an insurer of the visitor's safety, he is ordinarily under no duty to exercise any care until he knows or has reason to know that the acts of the third person are occurring, or are about to occur. He may, however, know or have reason to know, from past experience, that there is a likelihood of conduct on the part of third persons in general which is likely to endanger the safety of the visitor, even though he has no reason to expect it on the part of any particular individual. If the place or character of his business, or his past experience, is such that he should reasonably anticipate careless or criminal conduct on the part of third persons, either generally or at some particular time, he may be under a duty to take precautions against it, and to provide a reasonably sufficient number of servants to afford a reasonable protection.
See also, e.g., J.S., supra, 155 N.J. at 338, 714 A.2d at 928; James v. Arms Technology, Inc., 359 N.J.Super. 291, 324, 820 A.2d 27, 47 (App.Div.2003); Morris v. Krauszer's Food Stores, 300 N.J.Super. 529, 535, 693 A.2d 510, 513 (App.Div.1997); Gaita v. Laurel Grove Cemetery Co., 323 N.J.Super. 89, 94-96, 731 A.2d 1245, 1248-49 (Law Div.1998).
We find the totality of the circumstances presented in this case, when viewed in light of comment (f) and the considerations articulated in cases such as J.S., supra, 155 N.J. at 337-39, 714 A.2d at 927-29, give rise to a duty on the part of the Pub Zone to have taken reasonable precautions against the danger posed by the Pagans as a group. In this case, there was no reason to suspect any particular Pagan of violent conduct. Nor was violence to be expected at any particular time or in any particular circumstance. However, the gang was collectively known to Kerkoulas, a proprietor of the Pub Zone, to engage in random violence. Thus, in the language of Comment (f), Kerkoulas had knowledge as the result of past experience and from other sources that there was "a likelihood of conduct on the part of third persons in general" that was "likely to endanger the safety" of a patron at some unspecified future time. A "duty to take precautions" against the endangering conduct thus arose. See also Martinez v. Woodmar IV Condominiums Homeowners Assoc., 189 Ariz. 206, 941 P.2d 218 (1997) (en banc) (interpreting the Restatement (Second) of Torts § 344, Comment (f) as establishing a duty on the part of a condominium association to exercise reasonable precautions to safeguard guests from known criminal activity by gangs congregating in the condominium's parking lot, reversing summary judgment for the condominium, and remanding the case for trial on the issue of whether the duty had *700 been breached). Cf. Cassanello v. Luddy, 302 N.J.Super. 267, 695 A.2d 325 (App.Div. 1997) (finding that a tavern owner had a duty to protect patrons from the foreseeable off-premises acts of other patrons who were known to be inebriated and violent). See gen. Tavernkeeper's Liability to Patron for Third Person's Assault, 43 A.L.R.4th 281 (1986). Fairness and public policy dictate the recognition of a duty in this context, since no one would argue that gang violence should be tolerated or that preventable violence should be permitted to occur.
The imposition of a duty is further justified by the fact that the Pub Zone derived an economic benefit from affording protection to its patrons in circumstances such as these. Ivins v. Town Tavern, 335 N.J.Super. 188, 197, 762 A.2d 232, 237 (App.Div.2000); Cassanello, supra, 302 N.J.Super. at 273, 695 A.2d at 328. Indeed, testimony suggests that the Pub Zone ceased business shortly after plaintiff's attack as a direct result of its patrons' new-found perception that the tavern was dangerous. Moreover, we do not find the cost of reasonable security measures to be prohibitive in this context. See Hopkins v. Fox & Lazo Realtors, 132 N.J. 426, 447, 625 A.2d 1110, 1120 (1993) (observing that "[n]egligence has often been defined as the failure to take precautions that cost less than the damage wrought" by the harm.)
On appeal, Pub Zone relies on our decision in Ivins, supra, 335 N.J.Super. 188, 762 A.2d 232. In that case, we upheld an order of involuntary dismissal pursuant to Rule 4:37-2(b) in a case in which a bar patron was injured in the bar's parking lot while trying to break up a fight between a friend with whom the plaintiff had been drinking and another patron. However, we find that case to be distinguishable, since there, a basis existed for a determination that the aggressor was not then prone to violence, and neither the bar's location nor other incidents occurring in the parking lot were sufficient to give rise to a generalized duty to provide exterior security.
We do not regard our recognition of a duty in this case to give rise to either strict or absolute liability on the part of the Pub Zone, as the trial court hypothesized would occur. To fulfill its duty in this context, the Pub Zone was merely required to employ "reasonable" safety precautions. J.S., supra, 155 N.J. at 339, 350, 714 A.2d at 934 (requiring that "reasonable" protective steps be taken). It already had in place a prohibition against entry of Pagans and other bikers who were wearing their colors, and that prohibition, together with the practice of calling the police when a breach occurred, had been effective in greatly diminishing the occurrence of biker incidents on the premises. The evidence establishes that the prohibition was not enforced on the night at issue, that three Pagans were permitted entry while wearing their colors, and the police were not called. See Dubak v. Burdette Tomlin Memorial Hospital, 233 N.J.Super. 441, 458, 559 A.2d 424, 432-33 (App.Div.) (holding that "under certain circumstances, a tavern owner is duty-bound to summon the police when it is reasonably foreseeable that a patron may be otherwise harmed by the criminal acts of another."), cert. denied, 117 N.J. 48, 563 A.2d 817 (1989). Although evidence conflicted as to whether plaintiff had urged their admission, the jury was entitled to credit plaintiff's testimony that he did not, and that the decision to allow the Pagans in the bar was made solely by Kerkoulas. As Kerkoulas herself admitted, if the Pagans had not been present, the attack would not have occurred. Once entry was achieved, the Pub Zone remained under a duty to exercise reasonable precautions against an *701 attack. Whether such reasonable precautions were exercised can be decided against the Pub Zone in this case as a matter of law, since no evidence of security within the tavern itself at the time of the attack was presented.
The jury's verdict on the issue of liability must therefore be reinstated.

III.
Because we have resolved plaintiff's appeal by reversing the trial judge's entry of JNOV, we address the issues raised on the cross-appeal of the Pub Zone; namely, that reversible error occurred when the trial court precluded a claim of comparative negligence on plaintiff's part, when he permitted testimony by plaintiff's expert, and when he found the amount of the jury's verdict to be unchallengeable. We commence with comparative negligence. See N.J.S.A. 2A:15-5.1 to -5.8.
At trial, the court precluded a comparison of the negligence of the tavern and the plaintiff, holding that even if plaintiff had urged the admission of the three men, was generally aware of the attitudes and tendencies of the Pagans and should have kept a "wider berth from them," there was "nothing to suggest that he put himself into harms way where he had any reason to believe that something was going to happen." "The question is whether there was a breach of duty to provide a reasonably safe premises consistent with the scope of the invitation, which did include his being permitted to go throughout the premises."
Our analysis of the court's determination is principally governed by Blazovic v. Andrich, 124 N.J. 90, 590 A.2d 222 (1991) and informed by Martin v. Prime Hospitality Corp., 345 N.J.Super. 278, 785 A.2d 16 (App.Div.2001). See also Steele v. Kerrigan, 148 N.J. 1, 689 A.2d 685 (1997). However, we note at the outset that in this case, unlike Blazovic and Martin, the intentional tortfeasors (the three Pagans) have not been named as parties to the suit, and thus their fault cannot be considered for comparative negligence purposes as it was in those cases. Blazovic, supra, 124 N.J. at 106-08, 590 A.2d at 230-32; Martin, supra, 345 N.J.Super. at 284-86, 785 A.2d at 19-21.
We stated in Martin:
As explained in Blazovic, the defendant responsible for security should be precluded from relying on plaintiff's contributory negligence to offset its own responsibility only in circumstances where that defendant's duty encompassed the obligation to prevent the plaintiff's allegedly inappropriate conduct. Blazovic, supra, 124 N.J. at 111, 590 A.2d 222 [at 233] (Citing Cowan v. Doering, 111 N.J. 451, 458-67, 545 A.2d 159[, 162-67](1988); Suter v. San Angelo Foundry & Machine Co., 81 N.J. 150, 165-68, 406 A.2d 140[, 147-49] (1979); Soronen v. Olde Milford Inn, Inc., 46 N.J. 582, 589-92, 218 A.2d 630[, 634-36] (1966)).
[Martin, supra, 345 N.J.Super. at 287, 785 A.2d at 21.]
In Martin, a case in which an inebriated patron of a hotel sports bar voluntarily entered the room of an importunate guest and was subsequently sexually assaulted, we held that the proprietor had a duty to protect the plaintiff "only from foreseeable injuries, and only by reasonable actions." Id. 345 N.J.Super. at 288, 785 A.2d at 22. "In exercising such care, [the proprietor] should have taken reasonable steps to discover whether plaintiff was in danger or likely to be in danger and, if so, given warning or otherwise taken steps to protect plaintiff from the danger." Ibid. Despite this duty, in a case in which negligent sale of alcohol to a visibly intoxicated *702 patron was not alleged, plaintiff's voluntary drinking could constitute negligence to the extent that the drinking placed her in a precarious position. Id. at 289, 785 A.2d at 22.
Comparison of plaintiff's fault in the instant case was appropriate and required under Blazovic because [the proprietor's] duty, under the facts of this case, related to security and properly protecting plaintiff after she claimed to be intoxicated upon her return to the bar. Considering plaintiff's inappropriate drinking, which placed her in a precarious situation, would not in this case dilute or diminish [the proprietor's] duty to act.
[Id. at 290, 785 A.2d at 23.]
In the present case, the jury was simply asked whether the Pub Zone was negligent, whether that negligence was causally related to plaintiff's injuries and, if so, the amount of damages sustained. As a result, it is not possible to determine whether the jury found negligence in the admission of the Pagans or in the provision of security after their admission. Clearly, no negligence on the part of the plaintiff can be found under the former scenario. Nor do we find negligence as the result of any statement by plaintiff urging that the Pagans be permitted to remain. The Pub Zone, through the conduct of Kerkoulas and the doorman, Petey, controlled access to the tavern; plaintiff did not.
The issue thus becomes whether plaintiff engaged in inappropriate conduct following the entry of the Pagans that can form the basis for a claim of negligence on his part. We find that he did not, since he did nothing that was not expected of a patron of the Pub Zone and nothing that was not permitted by that entity. He drank (but not to excess), he moved from floor to floor of the establishment, and he utilized the restroom. Further, even assuming the recognition of a claim of comparative negligence on such a basis, no evidence at trial suggested that plaintiff had such particularized knowledge of the threat of unannounced and random violence posed by the Pagans' presence that, by entering the restroom either before, in the company of, or after the Pagans, he voluntarily encountered a known risk.

IV.
The Pub Zone next argues that the trial court abused its discretion in permitting plaintiff's expert on security, Leslie Cole, to testify at trial, arguing that his opinions regarding Kerkoulas' conduct in permitting the Pagans to enter the bar did not concern a subject that required expert testimony, the testimony lacked a proper foundation and was therefore unreliable, and Cole lacked the expertise on the issue of the danger posed by Pagan bikers to testify as he did. In its brief, the Pub Zone states that it does not address Cole's opinion that the three bikers should have been watched while in the Pub Zone "as there was no evidence of any behavior on their part which would have signaled an impending act of aggression." For that reason, we omit the issue from our discussion.
The record discloses that Cole, who holds a masters degree in criminal justice from John Jay College of Criminal Justice, is a certified protection professional (whose qualification by examination depended upon knowledge of mandatory subjects and of four specialized areas including restaurant and lodging security), and a certified security trainer serving as an adjunct professor at what was formerly known as Jersey City State College. Following his graduation from John Jay, Cole was corporate director of security for the Edison Parking Corporation and, since the *703 establishment of his own business in 1983, he has acted as a consultant to a hotel chain with bars and as a pro bono consultant on tavern security for his brother. Additionally, he has testified as a forensic expert in cases involving tavern and hotel security and had been qualified as an expert throughout New Jersey as well as in other states. His knowledge of the Pagans was gained while monitoring gang activity as President of the Board of Education for the Township of Union, from a Department of Justice/FBI federal task force report entitled "Safe Streets, a Violent Crime Initiative Report for Fiscal Year 2000," from a Justice Department publication regarding assaults in and around bars, and from an article by Robert Witherspoon entitled "Security for Taverns and Nightclubs." Although Cole testified that he did not specialize in the security of bars and taverns, per se, he stated that the fundamentals of security that were known to him were applicable to those businesses.
Cole testified that generally accepted security principles require a focus first upon the foreseeability of harm. That, he stated, was established by Kerkoulas's own testimony regarding her knowledge of the dangers posed by the Pagans and was confirmed by his own reading regarding them. Once a foreseeable danger from the Pagans was found to exist, security principles required that the tavern either prevent them from entering the premises or that it provide adequate numbers of trained and identifiable security personnel at the door and within the premises to avert foreseeable harm. Here, Cole noted, added evidence of potential violence was provided by the fact that three Pagans, wearing gang insignia, "muscled their way in initially" despite a sign prohibiting entry. Nonetheless, Kerkoulas, with knowledge of the heightened danger, breached accepted security principles by failing to deny entry to the Pagans, by not calling the police once they had gained access to the premises, and by not providing security within the bar, consisting of one person upstairs and one downstairs, to continuously monitor the Pagans' presence until they left.
We find, on the basis of the foregoing evidence, no error in the court's determination to permit Cole to testify. As the Pub Zone recognized in its brief, only three basic requirements exist for the admission of expert testimony:
(1) the intended testimony must concern a subject matter that is beyond the ken of the average juror; (2) the field testified to must be at a state of the art that such an expert's testimony could be sufficiently reliable; and (3) the witness must have sufficient expertise to offer the intended testimony.
[DeHanes v. Rothman, 158 N.J. 90, 100, 727 A.2d 8, 13 (1999) (quoting State v. Kelly, 97 N.J. 178, 208, 478 A.2d 364, 379 (1984)).]
Without any doubt, Cole had expertise as a security professional. Although he lacked significant practical experience in tavern security, Cole testified without contradiction that the basic security principles in which he had been trained were as applicable to taverns as to other businesses. Knowledge gained in this fashion is sufficient to render an expert qualified and to serve as a foundation for his opinion. See N.J.R.E. 702 (permitting qualification by knowledge, skill, experience, training or education); Katz v. Rahway Hosp., 214 N.J.Super. 379, 382, 519 A.2d 895, 897 (App.Div.1986) (in an action for damages arising from a mugging in a hospital parking lot, affirming determination to permit testimony by a security expert who lacked specific expertise in hospital *704 security), cert. denied, 107 N.J. 122, 526 A.2d 190 (1987).
Moreover, we find Cole's testimony to have been helpful to the trier of fact and his expertise to have been relevant to issues under consideration, since he could confirm and further elucidate through an analysis of governmentally-generated reports and other sources (the reliability of which, under N.J.R.E. 703, was not questioned at trial) Kerkoulas's knowledge of the dangers posed by the Pagans and the actual risk inherent in their presence, and could testify regarding concrete security measures to be taken in response to the foreseeable dangers posed by them. See N.J.R.E. 702 (requiring that specialized knowledge be of assistance to the trier of fact); Butler, supra, 89 N.J. at 283, 445 A.2d at 1147 (observing in a security context that expert testimony as to the standard of care would be an aid to the jury); Rempfer v. Deerfield Packing Corp. 4 N.J. 135, 141-42, 72 A.2d 204, 206-07 (1950) (establishing test of admissibility). Compare Nesmith v. Walsh Trucking Co., 247 N.J.Super. 360, 371-72, 589 A.2d 613, 619-20 (App.Div.1989)(dissenting opinion of Shebell, J.A.D.) (finding error in admission of testimony of expert whose qualifications did not encompass matters in issue), rev'd on dissent below, 123 N.J. 547, 589 A.2d 596 (1991); Polyard v. Terry, 160 N.J.Super. 497, 510-12, 390 A.2d 653, 659-61 (App.Div.1978), aff'd o.b. 79 N.J. 547, 401 A.2d 532 (1979). Although the measures recommended by Cole included prohibiting the Pagans' entry into the Pub Zone, a preventative measure previously adopted by Kerkoulas that defendant argues required mere common sense, not expert opinion, no evidence suggests that security must be an exotic concern. An expert need not be barred from testifying simply because the security measures that he espouses should have been evident to an untrained individual. Nor does the congruence between Kerkoulas' own security precautions (which the record demonstrates that she breached) and those recommended by Cole as generally accepted provide grounds for the argument that Cole's opinion was a net one. He testified that his opinion was based upon accepted security principles, and no evidence to the contrary was offered. Compare Buckelew v. Grossbard, 87 N.J. 512, 524, 435 A.2d 1150, 1156 (1981) (defining a net opinion).
As a consequence of the foregoing analysis, we find no abuse of discretion on the trial court's part in permitting the admission of Cole's testimony in this matter. Carey v. Lovett, 132 N.J. 44, 64, 622 A.2d 1279, 1289 (1993); Rempfer, supra, 4 N.J. at 141, 72 A.2d at 206-07.

V.
As a final matter, the Pub Zone argues that the jury's verdict of $300,000 was so disproportionate to plaintiff's injury and resulting disability as to shock the judicial conscience and provide grounds for a new trial. In this regard, the Pub Zone notes that plaintiff presented no claim for lost wages or for medical bills and no claim of permanent "functional problems" as the result of facial injuries. Further, although it acknowledges evidence of a herniated disc, the Pub Zone argues without supporting medical evidence that because no follow up care had been rendered, the herniation must have been inconsequential. As a final matter, the Pub Zone emphasizes the fact that within six months of the accident, plaintiff had opened his own tavern, performed renovations to its facilities, and operated it personally on a seven-day-per-week basis. The size of the jury verdict, the Pub Zone argues, resulted from an inference by the jury, drawn from closing comments by plaintiff's counsel, that since the Pub Zone had gone out of business *705 but nonetheless appeared at trial, it must have been insured.
In light of plaintiff's previously-described injuries and disabilities, which we view in the light most favorable to him, we find nothing to shock the judicial conscience in a verdict of $300,000 in this matter, finding liability to have been established and no substantial disproportion between the amount of the verdict and the extent of plaintiff's injuries, his treatment, and the residuals of the attack. Baxter v. Fairmont Food Co., 74 N.J. 588, 596-604, 379 A.2d 225, 229-33 (1977); Taweel v. Starn's Shoprite Supermarket, 58 N.J. 227, 231-36, 276 A.2d 861, 863-66 (1971). See also Caldwell v. Haynes, 136 N.J. 422, 433, 643 A.2d 564, 569-70 (1994) (discussing the goal of compensatory damages in a personal injury action). A facial attack of sufficient ferocity as to result in a cervical herniation, basal skull fracture, bleeding within the brain, the destruction of the orbit of the eye with reconstructive surgery on two occasions, together with other injuries, cannot be deemed inconsequential, warranting an award substantially more modest than that afforded. We thus find upon our review of the evidential record that the jury's verdict was well within the range of that which was permissible, and we decline to interfere with it.
Moreover, we find no basis for any claim of impropriety on the part of plaintiff's attorney in his closing argument. The fact that the Pub Zone closed shortly after the attack on plaintiff was something that Kerkoulas herself acknowledged and ascribed to the general perception that the tavern had become a dangerous place. The comments of plaintiff's attorney implied no more.
The order of judgment notwithstanding the verdict is reversed and the verdict in plaintiff's favor is reinstated. The relief sought by defendant the Pub Zone in its cross appeal is denied.
NOTES
[1] No argument has been raised that forbidding entry to a place of public accommodation by identifiable gang members was contrary to law.