**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5610-17T4

APRIL L. MCBRIDE, a/k/a
APRIL MCBRIDE and KYLE
MCBRIDE, her spouse,

       Plaintiffs-Appellants,

v.

STEPHANIE FAIR-
WILLOUGHBY,

       Defendant-Respondent,

and

CITY OF JERSEY CITY,
COUNTY OF HUDSON
and STATE OF NEW
JERSEY,

       Defendants.

_____

Argued October 2, 2019 – Decided February 4, 2020

Before Judges Hoffman and Firko.

On appeal from the Superior Court of New Jersey, Law Division, Hudson County, Docket No. L-4641-15.

Jorge R. DeArmas argued the cause for appellants (Davis, Saperstein & Salomon, PC, attorneys; David A. Drescher, on the briefs).

John V. Mallon argued the cause for respondent (Chasan Lamparello Mallon & Cappuzzo, PC, attorneys; John V. Mallon, of counsel and on the brief; Kelly A. Weber, on the brief).

PER CURIAM

Plaintiffs[1] appeal from the Law Division order dismissing their complaint against defendant,[2] after a jury returned a no-cause verdict in their negligence action arising out of a slip-and-fall accident on defendant's ice-covered sidewalk. Plaintiffs contend the trial court erred in allowing defendant's expert to render improper testimony. For the reasons that follow, we reverse and remand for a new trial.

I.

We begin by summarizing the most pertinent trial evidence. The parties reside on the same street in Jersey City, about eight houses apart. On the morning of Sunday, January 18, 2015, plaintiff planned to take her dog for a

---

[1] In this opinion, we refer to April and Kyle McBride collectively as "plaintiffs" and April McBride individually as "plaintiff." Plaintiff's husband sues per quod.

[2] Since defendant Stephanie Fair-Willoughby was the only remaining defendant when the case went to trial, we refer to her as defendant.

walk. Because "it looked wet outside," plaintiff first stuck her hand "out the window to see if there was any rain, or anything coming down." Feeling no precipitation, she decided to walk her dog "before it start[ed] to rain again." As plaintiff walked her dog in the direction of defendant's home, the sidewalk looked wet but she did not see any ice and had no difficulty walking. Upon walking onto the sidewalk in front of defendant's home, plaintiff slipped and fell on ice that covered the sidewalk; in the fall, she sustained a severe fracture of her right ankle.[3]

With the assistance of a passerby and Darren Robinson, a long-time neighbor of defendant, plaintiff managed to get up off the sidewalk. The pair then helped plaintiff over to a fence, where she held on, "standing on . . . one leg." From there, plaintiff called her husband on her cell phone and told him she had fallen.

According to plaintiff's husband, he arrived at the scene "fairly quickly." As he came down the block, he observed the pavement "looked . . . wet." When he viewed the area where plaintiff fell, "at first glance, it looked exactly the way

---

[3] Before trial, the parties agreed to a stipulation regarding the amount of plaintiffs' damages. As a result, the trial addressed only the issue of liability.

it looked when [he] walked down the street. . . . It just looked wet." Upon taking a closer look, he concluded "it was definitely ice. . . . black ice."

Plaintiffs also called Robinson as a witness. While he provided a statement to plaintiff's investigator within a month of the accident, by the time of trial, he required a subpoena to compel his appearance. In the statement he gave shortly after the accident, Robinson said it was "rainy and cold" the day of plaintiff's accident and that he observed "black ice on the ground." At trial, however, he described "[t]he whole block" as "solid ice," and claimed "it was raining ice." He further denied there was any difference in the thickness of the ice in the area where plaintiff fell. At that point, plaintiff's counsel confronted Robinson with testimony he gave at his deposition:

> Q: Mr. Robinson . . . in your deposition you were asked a question . . . 'Do you know how far away she was from [the] gate at the time she fell'? And your answer was, 'She was right on – next to the gate. Right next to it. But, like I said, she stepped into that part, because you got to remember it's a drain. A lot of water is coming down. In that part the ice was probably twice as thick as on the regular ground, and that when, boom, it was very slippery that morning. Very[,] state of emergency.'
>
> Now does – does that refresh your recollection that – that the ice was twice as thick?
>
> A: Not really, but maybe I did.

After Robinson testified, plaintiffs presented the de bene esse video-taped testimony of their liability expert, Michael Natoli, P.E.[4] According to Natoli, water from defendant's roof would accumulate in the gutters of defendant's home, and proceed through the downspout drainpipe onto defendant's driveway; at that point, "since the driveway is pitched towards the sidewalk[,] it just flows right across the sidewalk. . . . [D]uring the summer months, it's just water on the sidewalk. . . . [D]uring the winter months, it's water on the sidewalk that can turn to ice. And that's exactly what happened here."

Natoli identified two alternatives that defendant could have utilized to avoid discharging roof-runoff water across the public sidewalk – the downspout could have been piped underground to provide curbside discharge, or defendant could have created

> a drywell in the driveway where the downspout would empty into their drywell and it would just then percolate back into the ground. A drywell is nothing more than carving a hole in the ground . . . putting in some gravel rocks and then have the downspout pipes go into there, and what it does is it recharges the soil, but it doesn't add water to the sidewalk. And that's a very simple procedure . . . . to avoid discharging [onto] the public sidewalk.

---

[4] Plaintiffs took the deposition in September 2017, seven months before trial; in January 2018, Natoli passed away.

Defendant did not testify. The only defense witness was a liability expert, David Behnken, P.E., who took issue with the opinions expressed by plaintiff's expert. Behnken inspected the accident site in March 2017, a little over two years after plaintiff's accident. Behnken's report included photographs of the accident site and defendant's house; in some of the photographs, neighboring houses can be seen.

Behnken testified that Natoli's suggestions for avoiding the discharge of water across the public sidewalk were not practical, citing the small size of defendant's lot. Relevant to this appeal, the following exchange occurred on direct examination between defense counsel and Behnken:

> Q: Based on your examination of the downspout, and your experience and education, is there anything improper about the construction of that downspout?
>
> A: There's not. In this particular case, both adjacent neighbors to the left and right have the exact same conditions. I'm sure if you were to look around at all the neighboring houses –

At that point, plaintiff's counsel objected since Behnken's response provided an opinion not contained in his report regarding neighboring houses, which he did not inspect. The judge overruled the objection, after concluding that Behnken already established that "it's the proper way to do it."

Following the judge's ruling, Behnken testified that the houses on either side of defendant's house had "the same thing. They had downspouts at the front of the building . . . and they came down, discharged at grade . . . . [onto] driveways or walkways that flowed toward the street." At that point, plaintiff's counsel renewed his objection, again noting that Behnken's report contained no "mention of any comparison to the neighboring houses." The judge again overruled the objection, stating that Behnken "isn't tied to the corners [of his report]. It's his observation."

Behnken went on to dismiss Natoli's suggestion of installing a drywell to drain the runoff water, asserting it "would be extremely difficult to put in a drywell" and not have water go into the basement. Behnken did not address Natoli's alternate suggestion of avoiding the surface of the sidewalk by running a pipe from the downspout underground – and underneath the sidewalk – out to the street.

On cross-examination, Behnken acknowledged that, with freezing temperatures, discharging roof runoff across the public sidewalk creates a hazard:

> Q: Now can we agree, just as a general principle,
> that when the water flows from a drainpipe down
> a driveway and across a sidewalk during the

wintertime there's a potential for that - - that freezing over in a thin layer of ice. Is that correct?

A:     Yeah. There would be that potential for anything.

. . . .

Q:     So you certainly would want to – if you can avoid it, a situation where water flows down a drain and across a sidewalk, creates – and creates a thin layer of ice during the winter. Correct?

A:     Yes.

. . . .

Q:     So . . . you would agree that having a drainpipe that runs water across a sidewalk in winter adds some element of – of hazard or danger to the sidewalk?

A:     Potentially, it can, yes.

After the jury returned its verdict, finding that defendant was not negligent, plaintiffs filed a motion for a new trial, which the trial judge denied. This appeal followed.

II.

The question of sidewalk liability for pedestrian accidents turns on the use of the property abutting the sidewalk. Owners of properties used for commercial purposes owe a duty of care to pedestrians to keep the sidewalk abutting their property in a safe manner. Stewart v. 104 Wallace Street, Inc., 87 N.J. 146, 152-

53 (1981). By contrast, "[r]esidential homeowners can safely rely on the fact that they will not be liable <u>unless they create or exacerbate a dangerous sidewalk condition</u> . . . ." <u>Luchejko v. City of Hoboken</u>, 207 N.J. 191, 210 (2011) (emphasis added).

We review decisions to admit expert testimony "against an abuse of discretion standard." <u>Pomerantz Paper Corp. v. New Cmty. Corp.</u>, 207 N.J. 344, 371 (2011) (citing <u>Kuehn v. Pub Zone</u>, 364 N.J. Super. 301, 319-21 (2003)). "However, [w]hen the trial court fails to apply the proper test in analyzing the admissibility of proffered evidence, our review is de novo." <u>Konop v. Rosen</u>, 425 N.J. Super. 391, 401 (App. Div. 2012) (alteration in original) (internal quotation marks omitted). When reviewing a trial court's evidential rulings, we will only reverse if the error "is of such a nature as to have been clearly capable of producing an unjust result." <u>Parker v. Poole</u>, 440 N.J. Super. 7, 16 (App. Div. 2015) (quoting <u>R.</u> 2:10-2).

Plaintiffs argue the trial court committed harmful error when it allowed Behnken to testify regarding matters not contained in his report. Plaintiffs further contend that not only did this testimony come as a surprise, but it was also based on photographs of the area, as opposed to an actual investigation, and

served no legitimate basis for ascertaining whether or not defendant was negligent. We agree.

Expert testimony that deviates from the pretrial expert report may be excluded if the trial court finds "the presence of surprise and prejudice to the objecting party." Velazquez ex rel. Velazquez v. Portadin, 321 N.J. Super. 558, 576 (App. Div. 1999). A trial judge has the discretion to preclude expert testimony on a subject not covered in the written reports furnished in discovery. Ratner v. General Motors Corp., 241 N.J. Super. 197, 202 (App. Div. 1990); however, such a determination "must be just and reasonable." Mauro v. Owens-Corning Fiberglas Corp., 225 N.J. Super. 196, 206 (App. Div. 1988), aff'd sub nom, Mauro v. Raymark Industries, Inc., 116 N.J. 126 (1989).

Although an expert witness is generally confined to the opinions contained in his or her report provided in discovery, Conrad v. Robbi, 341 N.J. Super. 424, 440-41 (App. Div. 2001), "the logical predicates for and conclusions from statements made in [an expert] report are not foreclosed." McCalla v. Harnischfeger Corp., 215 N.J. Super. 160, 171 (App. Div. 1987).

Because Behnken testified that there was nothing improper about the design of defendant's downspout, the judge overruled the objection, explaining that Behnken "established that it's a proper way of doing it." While Behnken

gave his opinion that defendant did nothing improper, his testimony did not establish that placing a downspout so that it pours substantial water onto a sloped driveway, knowing the water will first cross a public sidewalk before reaching the street, is "a proper way of doing it."

In addition, we do not find that Behnken's opinions regarding adjacent houses, or other houses in the neighborhood, was a logical predicate of the information and opinions set forth in his expert report. Since Behnken did not examine any of these other homes, nor reference them in his report, plaintiffs had no reason to expect that Behnken would offer these extra opinions. The new opinions came as a complete surprise to plaintiffs and resulted in certain prejudice. See Westphal v. Guarino, 163 N.J. Super. 139, 146 (App. Div.), aff'd o.b., 78 N.J. 308 (1978) (noting that the opposing party must be protected from the effect of surprise and prejudice).

Behnken's testimony regarding the houses near defendant with similar drainage systems was essentially offered to prove that defendant was not negligent because "everyone does it." We are unpersuaded that this claim constitutes a valid defense. The defense that "everyone does it" is not an acceptable ground to absolve a defendant from liability in the absence of a reasonable justification for defendant's conduct or for the conduct of similarly-

situated persons. See Ashby v. Farmer's Ins. Co., 565 F. Supp. 2d 1188, 1214-15 (D. Or. 2008); see also, Via Christi Reg'l Med. Ctr., Inc. v. Reed, 298 Kan. 503, 527 (2013).

In addition, plaintiffs were deprived of the ability to verify the information Behnken presented with regard to the other properties which were not the subject of this lawsuit. As a result, plaintiff could not adequately cross-examine Behnken as to his newly-formed opinions or prepare an adequate response to such testimony.[5] We are satisfied that the trial judge mistakenly exercised her discretion in permitting Behnken's testimony and opinions commenting on other houses in the parties' neighborhood.

Lastly, we must consider whether the trial court's decision to allow Behnken to testify regarding other houses on the parties' street was "clearly capable of producing an unjust result[.]" R. 2:10-2.

The trial testimony of both parties' experts concluded that the drainage system on defendant's property caused roof-runoff water to stream down the driveway, over the public sidewalk, and thereafter into the street. Both experts confirmed that with freezing temperatures, this configuration creates a danger

---

[5] Because of the death of plaintiffs' expert before trial, they lacked the ability to recall their expert to try and rebut Behnken's surprise testimony.

or hazard. As a result, the record contains substantial evidence that defendant "create[d] or exacerbate[d] a dangerous sidewalk condition." Luchejko, 207 N.J. at 210. Notwithstanding this evidence in favor of plaintiffs, the record contains conflicting testimony regarding the nature, extent, and location of the icy conditions that caused plaintiff's fall.

We are satisfied the proofs in this case do not overwhelmingly favor one party or the other; hence, Behnken's improper testimony regarding other houses on the parties' street could have been the deciding factor in defendant's favor. Cf. State v. Frost, 158 N.J. 76, 87 (1999) (noting that where credibility is the central issue and the "jury must choose which of two opposing versions to credit, it simply cannot be said that the evidence is overwhelming[ly]" against one litigant or the other). The risk that the jury was improperly influenced by the trial court's decision to allow Behnken to present the challenged testimony is particularly high here because the jury was faced with deciding between the sharply conflicting opinions of Natoli and Behnken.

Under the circumstances of this case, we are convinced the trial court's error was "clearly capable of producing an unjust result[.]" R. 2:10-2. Behnken's improper testimony bore directly on the issue of defendant's

negligence and thus could readily have been outcome determinative. As a result, a new trial is required.

Reversed and remanded for a new trial. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-5610-17T4