PATRICIA J. BUCKELEW, NOW KNOWN AS PATRICIA J. PERA, PLAINTIFF-APPELLANT, v. LILLIAN GROSSBARD AND HOWARD GROSSBARD, EXECUTORS OF THE ESTATE OF PAUL J. GROSSBARD, M. D., DECEASED, DEFENDANTS-RESPONDENTS.

Argued March 23, 1981—Decided October 14, 1981.

*Emanuel Needle* argued the cause for appellant (*Kohn & Needle,* attorneys; *Emanuel Needle* and *M. Marvin Soperstein,* on the briefs).

*Richard E. Brennan* argued the cause for respondents (*Shanley & Fisher,* attorneys).

The opinion of the Court was delivered by

CLIFFORD, J.

In this action for personal injuries based on medical malpractice the trial court set aside a jury verdict in favor of plaintiff and entered judgment for defendant. The court held that plaintiff's expert had offered no more than a "net opinion,"

which, under *Parker v. Goldstein,* 78 *N.J.Super.* 472 (App.Div.), certif. den., 40 *N.J.* 225 (1963), was insufficient to warrant submitting to the jury the question of defendant physician's deviation from the applicable standard of care. The Appellate Division, in an unreported opinion, affirmed the judgment in favor of defendant. We reverse and remand the cause for a new trial on the issues of causation and damages.

I

Plaintiff, Patricia Pera, a thirty-six year old registered nurse at the time of trial, first consulted the defendant physician, a gynecologist, in 1973.[1] At that time she presented to Dr. Grossbard a history of gynecological and urinary problems, including the removal in 1963 of her left ovary because of a ruptured cystic tumor. During plaintiff's first visit Dr. Grossbard found that she had a urethrocele (a protrusion in the urethra) and rectocele (a protrusion or herniation of the rectum into the vagina). These conditions were surgically corrected later in 1973 by other physicians.

Miss Pera returned to Dr. Grossbard on January 20, 1975, complaining of profuse vaginal bleeding. On January 23 defendant performed a dilatation and curettage and bilateral fulguration transection via laparoscopy (a surgical destruction of the uterine tubes). On February 6 plaintiff returned complaining of bleeding, for which bed rest was recommended. On March 23 Dr. Grossbard had Miss Pera admitted to Beth Israel Hospital, Passaic, with a complaint of bleeding, and he performed a second dilatation and curettage on March 28. Because he discovered a nodular mass on the uterus and because bleeding

---

[1]Dr. Grossbard died after the institution of suit and before trial. The executrix and executor of his estate were substituted as defendants in the course of trial. References herein to "defendant" are to Dr. Grossbard.

Also, whereas the suit was started with the use of plaintiff's married name, the necessary amendment was made before trial to reflect plaintiff's use of her maiden name.

was continuous postoperatively, Dr. Grossbard recommended a total abdominal hysterectomy, which was completed on March 31.[2]

A few days after the hysterectomy plaintiff developed pain in the right side of the abdomen radiating into the groin and thigh. Dr. Kimmel, a cardiovascular specialist (likewise deceased as of the time of trial), was consulted because of the possibility of a thrombophlebitis (inflammation of a vein associated with formation of a clot within blood vessels). When plaintiff did not improve after several days under his therapy, Dr. Kimmel recommended an exploratory laparotomy (the surgical procedure of cutting into the abdominal cavity through the loin or flank)— this, because an unexplained mass was discovered in the right lower quadrant of the abdomen. On April 18 Dr. Grossbard performed the laparotomy, and it was during this operation that the occurrence forming the basis for this suit took place.

Plaintiff, being anesthetized during the surgery, had no personal knowledge of what transpired. When she awoke after the operation, she found herself in the intensive care unit. Thereafter she was moved to a private room, where she experienced "an awful lot of pain." When she complained to Dr. Grossbard, he told her there had been "a slight accident and he had cut into the bladder by mistake," and that was one of the reasons she was "as ill as [she] was."

Miss Pera was hospitalized until May 1. Shortly after discharge she developed bleeding and a urinary fistula, an abnormal tract from the urinary system that discharged urine to the abdominal incision. Therefore she returned to the hospital for reinsertion of the catheter that had been in place after the surgery but had been removed before discharge.

---

[2]None of the surgical interventions thus far alluded to is challenged as having been in any wise improper or as providing any basis for the claim of malpractice.

Plaintiff remained hospitalized an additional two weeks in May and was bedridden until the middle of June, when she attended her son's graduation ceremonies in a wheelchair. It was not until July that she ventured outside again, returning to nursing on a part-time basis in an administrative capacity. In December Miss Pera resumed this type of work on a full-time basis. In 1976 and again in 1978 she was hospitalized because of urinary bleeding. At the time of trial in July 1978 Miss Pera was under the care of a physician and suffered from recurrent infections, burning, chronic cystitis and muscle spasms, all treated by prescribed medications. She was unable to engage in any of the strenuous activities that she had enjoyed before April 1975, such as golf and bowling.

As part of the plaintiff's case Dr. Grossbard's deposition testimony was read into the record, whence comes the only recitation of the operative procedure other than what appears in the operative notes. Dr. Grossbard first determined the location of the mass, then made an incision through the incision previously made for the hysterectomy. Proceeding "very slowly" he "just kept on incising and found "a substantial amount of scar tissue under the skin." Finally he "got down to what I thought was the peritonea (sic: pertitoneum, the serous membrane lining the interior of the abdominal cavity and surrounding the organs contained therein). And I made a very small incision into what I thought was a peritonea and after making a small incision it did not look like peritonea to me. And we stopped at this point and I put a probe into the point where I thought the peritonea was, but this was the incision and it turned out to be the urinary bladder."

Dr. Grossbard resisted the suggestion that his cutting of the bladder was a "mistake." His explanation of the event was that "[t]his was an abnormality which was caused by the patient's previous surgical procedures which I had not anticipated nor felt reasonably sure that that could have been a urinary bladder at that point." He acknowledged having performed three prior

surgical procedures, albeit "in different areas," and conceded his familiarity with the 1973 surgery.

As soon as he realized that he had cut into plaintiff's bladder, Dr. Grossbard summoned a urologist, Dr. Zigendorf, who fortunately was "next door" and was able to do the necessary repair within minutes. Thereafter the operation proceeded without incident: the mass was located, the condition corrected, and "things" were "put back where they belonged." A catheter was inserted to drain the injured bladder.

Plaintiff produced an expert witness, Dr. Tuby, who was retained by plaintiff's attorneys to review the records of Miss Pera's confinements in Beth Israel Hospital until May 1, 1975, and from May 13 through May 26, 1975, and to furnish an opinion. According to the witness, standard practice in the type of exploratory operation performed on plaintiff requires the surgeon to be "particularly careful" that an underlying vital structure not be injured. "In this particular instance," he said, "there were adhesions and fibrous tissue because she had a number of operations at that particular site. The urinary bladder lies in that area so that when one does a dissection in that particular area, they have to be very careful that they don't injure an underlying vital structure." It was Dr. Tuby's opinion that Dr. Grossbard "deviated from the accepted standards of medical practice when he failed to exercise the necessary care to avoid cutting into the urinary bladder and causing an opening measuring a quarter of an inch to three-eights of an inch in length * * *. [H]e should have exercised meticulous care to avoid injuring the underlying vital structures such as the urinary bladder."

Based on his review of Miss Pera's prior medical history, which had been furnished to him by plaintiff's counsel, and his examination of the hospital records, Dr. Tuby concluded that plaintiff's complaints "as to burning sensation, et cetera," were "commensuratory" (sic) with the type of injury that occurred during the exploratory operation. Defense counsel's objection

to a hypothetical question designed to elicit Dr. Tuby's opinion as to permanency was sustained, apparently because the doctor had not examined any of the hospital records of plaintiff's prior operations or conducted any physical examination of plaintiff.

The trial court denied defendant's motion to dismiss at the conclusion of plaintiff's case but ruled that the doctrine of *res ipsa loquitur* was inapplicable. A motion to strike "any elements of permanency" was granted.

Defendant's case consisted of the testimony of Dr. Felix Vann, a board-certified specialist in obstetrics and gynecology. Whereas he agreed with plaintiff's expert that meticulous care is required in the type of surgery performed on plaintiff, Dr. Vann's opinion was that Dr. Grossbard had indeed exercised the requisite degree of care. He specifically disagreed with Dr. Tuby's assertion that "the very fact that this happened indicates that there was a lack of meticulousness or lack of care," and said further that "any surgeon who has done any degree of this type of work has had such an experience."

The defense expert's reconstruction of the surgical accident was in part as follows:

[W]hat he was dissecting was scar tissue. Once he was through, once he was through the skin and your scar tissue ends at whatever structure is beneath it, and he was looking for the source of this mass which, as I stated before, could have been a collection of serum in a cavity, it could have been the collection of blood in a cavity or if he had not found either of these things, he obviously was negligent anticipating that he would open the peritoneal cavity, but I am assuming that in this instance, because of her prior surgery and the extent of the scar tissue there that the bladder was not in its usual anatomical position behind the pubic bone.

\*    \*    \*    \*    \*    \*    \*    \*

[H]e was going down layer by layer attempting to find the cause of the mass in the abdominal wall and this apparently was separate from the mass that he felt in the pelvis on his examination under anesthesia and as he was approaching the fascia and the muscle layer, the bladder was high and this was the time that it was inadvertently opened.

Despite Dr. Grossbard's concession, as set forth in his deposition, that he cut the bladder when in fact he thought he was making an incision into the peritoneum, Dr. Vann insisted that

the operating physician was not "looking for the peritoneum" and that "the opening into the bladder had nothing to do with his searching for the peritoneum"—conclusions he drew from examining the operative notes in the hospital record.

The trial court reserved decision, pursuant to *R.* 4:40–2, on defendant's motion to dismiss at the close of the testimony. The jury returned a verdict in plaintiff's favor for $80,000 which defendant challenged by a motion for judgment notwithstanding the verdict, a new trial or remittitur. The trial court entered judgment for defendant *n.o.v.*, concluding that plaintiff had failed to establish by expert testimony that defendant had deviated from the requisite standard of care. More particularly, the court characterized Dr. Tuby's opinion as a "typical example * * * of a net opinion, which would not warrant this matter going to a jury in the first place" under *Parker v. Goldstein, supra.*

Plaintiff appealed from the judgment entered in defendant's favor and defendant cross-appealed, presumably to protect his interests should the original jury verdict in plaintiff's favor be restored and judgment entered thereon. We granted plaintiff's petition for certification, 85 *N.J.* 115 (1980), following the Appellate Division's affirmance of the judgment.

The Appellate Division's summary affirmance was supported by the lone reference to *Schueler v. Strelinger,* 43 *N.J.* 330 (1964). The cited case is authority for the two fundamental propositions that (1) "[t]he law * * * imposes upon [a physician] the duty to exercise in the treatment of his patient the degree of care, knowledge and skill ordinarily possessed and exercised in similar situations by the average member of the profession practicing in his field," *id.* at 344 and (b) "[w]ith the rare exceptions * * * evidence of a deviation from accepted medical standards must be provided by competent and qualified physicians." *Id.* at 345. On this appeal plaintiff argues that the tests posed by the stated propositions were met in that there was proof of defendant's negligence, both in the form of direct

medical expert testimony and of an inference generated by the application of the doctrine of *res ipsa loquitur.*

## II

The first question is whether the record yields sufficient direct proof of defendant's negligence to support the jury verdict on liability. We conclude that it does when the deposition testimony of defendant and the trial testimony of his medical expert are read together.

The defense expert agreed with Dr. Tuby that the performance of the exploratory operation called for meticulous care on the part of the surgeon. This was so at least in part because of the accumulation of adhesions and fibrous tissues from numerous previous operations and because of the likelihood, as testified to by Dr. Vann, that the bladder was higher than its usual anatomical position behind the pubic bone. It was reasonable to expect to find such an anatomical abnormality, according to the defense expert, because of the "prior surgery and the extent of the scar tissue there." Yet this was the very abnormality the defendant had not anticipated, despite his intimate familiarity with plaintiff's medical history. Indeed, he testified that he felt "reasonably sure" that the urinary bladder was not at the point where he made the incision, believing that he was cutting the peritoneum. This, coupled with the unexplained divergence of Dr. Grossbard's testimony (that he made an incision into what he thought was the peritoneum) from the information in the operative notes (as recited by Dr. Vann) suggesting that defendant was not looking for the peritoneum, assuredly formed an adequate basis for the jury's conclusion that "meticulous care" had not been exercised under the circumstances.

## III

Plaintiff further contends that there is a sufficient basis in the evidence for application of the doctrine of *res ipsa loquitur.*

Defendant counters that the "common knowledge" element of *res ipsa loquitur* is missing and that it cannot be found in the testimony by Dr. Tuby, which amounted to no more than a "net opinion."

The trial court's determination that Dr. Tuby's testimony was indeed a "net opinion" was the basis for its judgment *n.o.v.* Defendant, seeking to support that judgment, described the doctor's reasoning as "circular:" defendant failed to exercise meticulous care as demonstrated by the fact that he cut the bladder; he cut the bladder because he did not use meticulous care.

In *Parker v. Goldstein, supra,* a medical malpractice case, an expert testified that defendant's delay in performing a Caesarian section caused decedent's death from pulmonary embolism. He did not, however, explain the facts and assumptions on which his conclusion was based. The Appellate Division, observing that "an opinion is no stronger than the facts which support it," 78 *N.J.Super.* at 484 held that the expert had given a "net opinion" insufficient to establish the element of causation. *Id.* at 483–84. See also *Delesky v. Tasty Baking Co.,* 175 *N.J.Super.* 513, 519–20 (App.Div.1980); *Suchit v. Baxt,* 176 *N.J.Super.* 407, 414–15 (Law Div. 1980) (noting that the rule is derived from *Evid.R.* 56(2)).

■ The "net opinion" rule appears to be a mere restatement of the established rule that an expert's bare conclusions, unsupported by factual evidence, is inadmissible. It frequently focuses, as in *Parker v. Goldstein, supra,* on the failure of the expert to explain a causal connection between the act or incident complained of and the injury or damage allegedly resulting therefrom. See *Stanley Co. of America v. Hercules Powder Co.,* 16 *N.J.* 295, 305 (1954); *Rempfer v. Deerfield Packing Corp.,* 4 *N.J.* 135, 145 (1950); *Castroll v. Franklin Twp.,* 161 *N.J.Super.* 190, 193 (App.Div. 1978). *Evid.R.* 56(2)(a) further provides that

the testimony must be based "primarily on facts, data or other expert opinion established by evidence at the trial * * *." [3]

Although Dr. Tuby's opinion might be vulnerable as a "net opinion" were it offered solely as direct evidence of defendant's negligence in this case, we think it can and should be read as forming an integral part of the foundation for the rule of *res ipsa loquitur.*

We start with the basic proposition that ordinarily negligence must be proved and will never be presumed, that indeed there is a presumption against it, and that the burden of proving negligence is on the plaintiff. *Hansen v. Eagle-Picher Lead Co.*, 8 *N.J.* 133, 139 (1951). The doctrine of *res ipsa loquitur* permits an inference of defendant's negligence "where (a) the occurrence itself ordinarily bespeaks negligence; (b) the instrumentality was within the defendant's exclusive control; and (c) there is no indication in the circumstances that the injury was the result of the plaintiff's own voluntary act or neglect." *Bornstein v. Metropolitan Bottling Co.*, 26 *N.J.* 263, 269 (1958).

---

[3]*Parker* v. Goldstein, supra, *indicates that an expert must state on direct examination the basis for his opinion. 78* N.J.Super.* at 480–82. It was decided before the current Rules of Evidence were enacted and relies heavily on* Dwyer v. Ford Motor Co., *36* N.J. *487 (1962), in which this Court stated that the mere assertion of causality would not justify a workers' compensation award: "[T]he reasons for the assertion are more important than the assertion itself."* Id. *at 494.*

Under *Evid.R.* 57 an expert need not state on direct examination the facts and assumptions on which his opinion is based (unless these facts are not already in evidence, see *Evid.R.* 56(2)), except if the court so requires. See also *Evid.R.* 58, which dispensed with the requirement that a hypothetical question include all the facts and assumptions on which the opinion would be based.

*Dwyer* dealt with a weight of the evidence problem, whereas *Parker* and the case under consideration are concerned with the establishment of a *prima facie* case. *Parker*'s requirement that the expert testify on direct examination to the factual basis for his opinion is no longer valid in light of the Evidence Rules referred to above and is not supported by *Dwyer*.

*Res ipsa loquitur* is grounded in probability and the sound procedural policy of placing the duty of producing evidence on the party who has superior knowledge or opportunity for explanation of the causative circumstances. *Id.* The effect of the doctrine is to establish a *prima facie* case by permitting the jury to infer negligence. *Id.* This inference, however, is purely a permissive one that the jury is free to accept or reject. *Kahalili v. Rosecliff Realty, Inc.,* 26 *N.J.* 545, 606 (1958). Furthermore, the rule does not shift the burden of persuasion; the most that is required of defendant is explanation, not exculpation. *Id.*

In the present case we are concerned with the first of the three elements of *res ipsa loquitur,* namely, the requirement that the act complained of—incision of the bladder in the course of this kind of exploratory laparotomy—ordinarily bespeaks negligence. Plaintiff urges that a fair reading of Dr. Tuby's testimony establishes that absent negligence, plaintiff's injury would not ordinarily have occurred. Resolution of the issue requires a full appreciation of the role of expert testimony in the *res ipsa loquitur* context.

Whether an occurrence "ordinarily bespeaks negligence" depends on the balance of probabilities being in favor of negligence. See *Zentz v. Coca-Cola Bottling Co.,* 39 Cal.2d 436, 247 *P.*2d 344 (Cal.1952). Courts of this state have long recognized that depending upon the probabilities, the *res ipsa loquitur* doctrine can apply in a medical malpractice context. *Sanzari v. Rosenfeld,* 34 *N.J.* 128, 140 (1961) ("Where, for example, a surgical sponge is left inside a patient after an operation, it is reasonable to say the probability is that someone has been negligent." *Ibid.*); *Magner v. Beth Israel Hosp.,* 120 *N.J.Super.* 529, 533 (App.Div.1972); *Terhune v. Margaret Hague Maternity Hosp.,* 63 *N.J.Super.* 106 (App.Div.1960); *Becker v. Eisenstodt,* 60 *N.J.Super.* 240 (App.Div.1960); *Toy v. Rickert,* 53 *N.J.Super.* 27 (App.Div.1958); *Steinke v. Bell,* 32 *N.J.Super.* 67 (App.Div. 1954); *Gould v. Winokur,* 98 *N.J.Super.* 544 (Law Div.1968),

aff'd, 104 *N.J.Super.* 329 (App.Div.1969). Each of the above malpractice cases implicated the proposition that as a matter of common knowledge within the ken of lay jurors, the accident in question would not have occurred had the defendant adhered to the appropriate standard of his profession. When that principle is applicable, plaintiff need not produce expert testimony to demonstrate defendant's deviation from the standard. We continue to endorse that proposition, which remains undiminished in this jurisdiction. However, the instant case is not suited to its application, for we cannot say that on the facts before us, as a matter of common understanding, the injury to plaintiff's bladder raises an inference of negligence.

Nevertheless, the requisite probability of negligence may exist quite independently of the awareness or "common knowledge" of the lay community. Expert testimony to the effect that those in a specialized field of knowledge or experience consider a certain occurrence as indicative of the probable existence of negligence is at least as probative of the existence of such a probability as the "common knowledge" of lay persons. We hold, therefore, that expert testimony to the effect that the medical community recognizes that an event does not ordinarily occur in the absence of negligence may afford a sufficient basis for the application of the doctrine of *res ipsa loquitur.* For today's purposes that rule is sufficient to decide the case. We leave for another day the question of whether New Jersey should adopt, in this rapidly developing field of the law, the principle expressed in comment d to section 328D of the Second Restatement of Torts, which permits the establishment of "common knowledge" by expert testimony, without reference to what is accepted as a "given" within medical circles. Comment d reads in pertinent part as follows:

> In the usual case the basis of past experience from which this conclusion [that such events do not ordinarily occur unless someone has been negligent] may be drawn is common to the community, and is a matter of general knowledge, which the court recognizes on much the same basis as when it takes judicial notice of facts which everyone knows. It may, however, be supplied by the evidence of the parties; and expert testimony that such an event usually does

> not occur without negligence may afford a sufficient basis for the inference. Such testimony may be essential to the plaintiff's case where, as for example in some actions for medical malpractice, there is no fund of common knowledge which may permit laymen reasonably to draw the conclusion.

See *Walker v. Rumer,* 72 *Ill.*2d 495, 501, 21 *Ill.Dec.* 362, 364, 381 *N.E.*2d 689, 691 (Ill.1978); *Perin v. Hayne, Iowa,* 210 *N.W.*2d 609, 614–15 (Iowa 1973). See also *Seneris v. Haas,* 45 *Cal.*2d 811, 822–24, 291 *P.*2d 915, 922 (Cal.1955); *Mayor v. Dowsett,* 240 *Or.* 196, 217, 400 *P.*2d 234, 244 (Or.1965); *Horner v. N. Pac. Beneficial Ass'n, Hospitals, Inc.,* 62 *Wash.*2d 351, 360–61, 382 *P.*2d 518, 524 (Wash.1963); *Fehrman v. Smirl,* 20 *Wis.*2d 1, 5–6, 121 *N.W.* 2d 255, 258 (Wis.1963).

It should be emphasized that the introduction of expert testimony to establish the first element of *res ipsa loquitur* will by no means be conclusive of the issue of negligence for, as we have pointed out, *supra* at 525–526, the doctrine merely permits, but does not require, the jury to infer negligence. Moreover in a case such as this defendant may offer contrary expert testimony to persuade the jury not to draw the inference permitted by the rule. See Note, *The Use of Expert Evidence in Res Ipsa Loquitur Cases,* 106 *U.Pa.L.Rev.* 731, 738 (1958).

In the instant matter the trial court erred in not giving plaintiff the benefit of the *res ipsa loquitur* doctrine. Although the questions put to and answers given by Dr. Tuby did not fit precisely into the classic mold of interrogation for creation of a *res ipsa loquitur* case, nevertheless a fair reading of the doctor's testimony indicates that in his opinion it is common knowledge within the medical community that the type of accident that took place in this case does not ordinarily occur in the absence of the surgeon's negligence. Whereas we bring to our reading of Dr. Tuby's testimony a certain indulgence, in the context of our establishing a new rule of law, on the retrial the court should demand circumspect adherence to the requirements of that rule.

In that connection we underscore this note of caution: it will not be sufficient for plaintiff's expert simply to follow slavishly a "common-knowledge-within-the-medical-community"

formula. There must be some evidential support, experiential or the like, offered for the expert's conclusion that the medical community recognized that the mishap in question would not have occurred but for the physician's negligence. If the plaintiff's expert's direct and cross-examination provide no basis for the witness's "common knowledge" testimony other than the expert's intuitive feeling—in other words, no more than a flat-out statement designed to satisfy the "common knowledge" test—then the court should not apply the *res ipsa* doctrine to the proceedings.

In the instant matter the trial court's error in ruling out the doctrine of *res ipsa loquitur* persists even though there was sufficient direct evidence of defendant's negligence to justify the verdict. Plaintiff was entitled to resort to both the doctrine and direct proof. *E. g., Martin v. Perth Amboy Gen. Hosp.,* 104 *N.J.Super.* 335 (App.Div.1969).

## IV

Plaintiff seeks a new trial on the issues of causation and damages, a request joined in by defendant should we conclude that the liability question was properly determined in plaintiff's favor. We agree that a new trial on these issues is appropriate.

The trial court ruled that Dr. Tuby would not be permitted to testify as to whether plaintiff's complaints since the time of the alleged malpractice were caused by the injury to her bladder, with the exception of her complaint related to the need for the catheter and the discomfort it caused. The ruling was based on the fact that Dr. Tuby had not examined Miss Pera nor had he seen the medial records of plaintiff's prior or subsequent operations.

We have earlier adverted to the rule that an expert's opinion must be based on all the facts relevant to the inquiry. *Stanley Co. of America v. Hercules Powder Co., supra,* 16 *N.J.* at 305; *Rampfer v. Deerfield Packing Corp., supra,* 4 *N.J.* at 144–45. In this case the relevant facts were plaintiff's complaints and prior

medical history, to which Dr. Tuby had heard plaintiff testify. See *Evid.R.* 56(2)(a). Physical examination of the plaintiff was not a prerequisite for this testimony. *Cf. Savoia v. F. W. Woolworth Co.*, 88 *N.J.Super.* 153, 163 (App.Div.1965) (expert could testify where he had examined photos of object in question but had not examined object itself). On remand plaintiff should be permitted to introduce evidence regarding the causal relationship between plaintiff's complaints and the incision as well as the permanent nature of her condition. The quantum of damages, if any, to be awarded will depend upon the fact-finder's determination on causation in respect of all the elements of damage.

Reversed and remanded for further proceeding consistent with this opinion.

For *reversal*—Chief Justice WILENTZ and Justices SULLI-VAN, PASHMAN, CLIFFORD, SCHREIBER, HANDLER and POLLOCK—7.

For *affirmance*—None.