847 A.2d 14 (2004)
368 N.J. Super. 466
James E. BENNETT, Plaintiff-Appellant,
v.
William LUGO a/k/a William Cruz, Defendant-Respondent.
Superior Court of New Jersey, Appellate Division.
Submitted March 24, 2004.
Decided April 27, 2004.
*16 Michael Patrick Mullen, Cherry Hill, attorney for appellant.
Jackson & Dimeo, attorneys for respondent (Jill L. Teague, on the brief).
Before Judges KING, LINTNER and LISA.
*15 The opinion of the court was delivered by LISA, J.A.D.
Plaintiff appeals from an order for summary judgment dismissing his complaint for personal injuries arising out of a motor vehicle accident for failure to satisfy the verbal threshold under the 1998 Automobile Insurance Cost Reduction Act (AICRA), N.J.S.A. 39:6A-8a. Plaintiff's claim is based upon an alleged serious permanent low back injury caused by the motor vehicle accident. Plaintiff had suffered several injuries to his low back prior to this accident. Therefore, to survive summary judgment, it was incumbent upon plaintiff to present a comparative analysis, based upon medical records prior to this accident with objective medical evidence after this accident, in order to compare plaintiff's residual injuries prior to the accident with those suffered in the accident. Polk v. Daconceicao, 268 N.J.Super. 568, 575, 634 A.2d 135 (App.Div.1993). The motion judge concluded that plaintiff did not submit a sufficient Polk analysis and therefore did not overcome the threshold. Ibid. On appeal, plaintiff contends the findings of the motion judge were inadequate and plaintiff's medical proofs provided the required Polk analysis and created a jury issue that plaintiff suffered a serious permanent injury as a result of the current motor vehicle accident, which was sufficiently differentiated from any residuals resulting from his prior injuries to that same body part, and that his injury caused a serious impact on his life. We agree with plaintiff and reverse.
The current accident occurred at about 11:00 p.m. on December 16, 2000. Plaintiff was the operator of his vehicle. He was proceeding at about 5 m.p.h. through a controlled intersection on the green light. The vehicle operated by defendant, William Lugo, approached the intersection from plaintiff's left side, attempted to stop on the wet roadway because he had the red light, but hydroplaned into the intersection, colliding with plaintiff's driver's side front fender. We are unable to determine from the record the speed of Lugo's vehicle. We do know that plaintiff's vehicle was inoperable after the collision and was removed from the scene.
At the accident scene, plaintiff expressed "a minor complaint of a neck injury," and he was taken by ambulance to the Cooper Hospital emergency room in Camden. There he reported neck and back pain. The diagnosis was a trapezius strain. Plaintiff was released for follow-up with his personal physician.
Plaintiff began a course of treatment with his personal physician, Dr. Harvey Benn, who ordered various diagnostic studies, including MRIs that were performed on December 20, 2000 and December 27, 2000. An EMG and nerve conduction studies were performed on February 27, 2001. Benn initiated a course of physical therapy and referred plaintiff to various specialists for consultations and treatment.
We digress from the current chronology of events to mention plaintiff's prior injuries and treatment involving his low back. In 1987, while in the military, plaintiff *17 injured his back while lifting a "tank starter," weighing approximately sixty pounds. Plaintiff believes he suffered a herniated lumbar disc at that time. He continued on light duty until being discharged from the military in 1989. He was awarded a 20% disability benefit as a result of that condition.
On March 28, 1990, while working as a security guard, plaintiff was in a stationary trailer, which was struck by a vehicle being pursued by the police in a high speed chase. The vehicle actually penetrated the trailer. Plaintiff was thrown about inside the trailer. He underwent a course of treatment, culminating in surgical intervention on January 7, 1992. The surgery consisted of an L5-S1 laminectomy and discectomy. It was confirmed at that time that plaintiff had suffered a herniated nucleus pulposus.
Then, while still undergoing a course of physical therapy, on November 12, 1992, plaintiff was riding a bicycle when he was struck by a motor vehicle. He was thrown from the bicycle and aggravated his back injury. He continued on his course of physical therapy and was released from treatment in or about 1993. Both parties agree that no further diagnostic testing was performed after 1992 and prior to the current motor vehicle accident of December 16, 2000.
Plaintiff was thirty-six years old at the time of the current accident. Plaintiff is a graduate of high school and a technical institute, and he attended a truck driving training program. From 1994 to 1998, plaintiff held several jobs, with some gaps in between them. For the two-year period immediately preceding the current accident, plaintiff held three truck driving jobs, with only a three-month interruption between February and May 2000. He quit his most recent job with National Freight only three days before the accident, because his status was going to be changed from driving local jobs, where he went home each night, to long hauls all over the country, where he would be away from home for ten to fifteen days at a time.
Plaintiff contends he would have sought, and believes he would have obtained, another truck driving job soon after leaving National Freight, but has been unable to do so because of his injuries. While working for National Freight, plaintiff was a driver, and was not required to load or unload cargo. He did light lifting, but was not required to lift anything over fifty pounds while working for National Freight.
Plaintiff contends that during the time preceding the current accident, he experienced "light lower back pain," which he had since the time of his military disability. Since the accident, he contends he has suffered severe pain, shooting and radiating into his lower extremities. Plaintiff contends he had not experienced this kind of pain since prior to his 1992 surgery. Plaintiff contends he has been prevented from obtaining employment. In his deposition testimony, plaintiff explained it this way:
Prior to the accident I had a job. I had a full-time job. I would climb in and out of my truck, no problem. Drive for like I said, eight or ten hourten or twelve hour working days, come back. I didn't have any pain. You know, I could get back up the next morning and continue on my routine of five days a week.
To now is like getting out of bed is painful. You know, walking around is painful. Trying to make it to my doctor appointment sessions is painful. Walking to the bus stop is painful. Standing for long periods of time is painful.
We return now to the chronology of plaintiff's treatment after the current accident. *18 Benn referred plaintiff to Dr. John Yulo, a specialist in physical medicine and rehabilitation, and to Dr. Steven H. Kahn, an orthopedic specialist. These referrals were made within one or two months after the accident. Benn later referred plaintiff to Dr. Joan F. O'Shea, a neurosurgeon, who first evaluated plaintiff on March 26, 2002. She performed further MRI studies at that time.
We need not describe in detail the various diagnoses made over the course of plaintiff's treatment. Without dispute, the various diagnostic studies reveal a large disc herniation at the L5-S1 level. Because there were no intervening diagnostic tests performed between 1992 and 2000, the question is whether this condition was caused or aggravated by the current accident, or whether it was entirely a pre-existing condition. Plaintiff's physicians have opined that the current condition is permanent and disabling in nature, can be expected to deteriorate, and may require future surgery, including fusion of the affected vertebrae.
When a plaintiff alleges aggravation of a pre-existing injury or condition as a basis for overcoming the verbal threshold, an analysis differentiating pre-existing injury from that caused by the current accident is required:
A diagnosis of aggravation of a pre-existing injury or condition must be based upon a comparative analysis of the plaintiff's residuals prior to the accident with the injuries suffered in the automobile accident at issue. This must encompass an evaluation of the medical records of the patient prior to the trauma with the objective medical evidence existent post-trauma. Without a comparative analysis, the conclusion that the pre-accident condition has been aggravated must be deemed insufficient to overcome the threshold of N.J.S.A. 39:6A-8a.
[Polk, supra, 268 N.J.Super. at 575, 634 A.2d 135.]
Although Polk predated AICRA, a Polk analysis continues to be required in cases governed by AICRA. Ostasz v. Howard, 357 N.J.Super. 65, 67, 813 A.2d 1258 (App.Div.2003). Further, a Polk analysis is required to differentiate a subsequent injury to a body part that was previously injured whether aggravation of the prior injury is alleged or not. Sherry v. Buonansonti, 287 N.J.Super. 518, 521-23, 671 A.2d 606 (App.Div.), certif. denied, 144 N.J. 588, 677 A.2d 760 (1996). Comparative analysis is required whenever previous injury to the same body part is involved. Loftus-Smith v. Henry, 286 N.J.Super. 477, 491, 669 A.2d 852 (App. Div.1996). Thus, plaintiff is required to submit a sufficient Polk analysis here.
To satisfy the Polk requirement, plaintiff relied upon the June 5, 2003 report of Dr. Kahn. As we have noted, Kahn began his participation in plaintiff's treatment soon after the injury, specifically on February 1, 2001. He saw plaintiff periodically over the next two years or so, and continued to evaluate him, make recommendations for his treatment and participate in his care. In his June 5, 2003 report, which consisted of five single-spaced pages, Kahn described plaintiff's three prior back injuries and pertinent medical records pertaining to them. He also described the injuries resulting from the December 16, 2000 motor vehicle accident and the diagnostic tests performed in the aftermath of that accident.
In his report, Kahn described plaintiff's prior injury, diagnostic tests and surgery:
After appropriate workup by his treating orthopedic surgeon, Dr. Mitchell, an MRI had been performed on October 2, 1990, and did reveal posterior disc bulging at the L4-5 level indenting the ventral *19 aspect of the thecal sac as well as ventral indentation over the thecal sac on lateral and right oblique projections which was suspicious for herniation at the L5-S1 level. There was posterior displacement of the right, S1 nerve root. Mr. Bennett subsequently underwent physical therapy under Dr. Mitchell's care but this was to no avail. He underwent a laminectomy from L4 through the sacrum with subsequent discectomy under the care of Dr. Mitchell in January, 1992. Mr. Bennett underwent the appropriate physical therapy for this subsequent surgery secondary to the herniated disc.
[Emphasis added.]
He then described the current injury:
He was then involved in the motor vehicle accident on December 16, 2000, as enumerated above. He first presented to my office on February 1, 2001, with the working diagnosis of cervical, thoracic and lumbar sprain and strain, recurrent disc herniation right at L5-S1 with a moderate disc bulge at L4-5 causing central canal stenosis and clinical evidence of right sided sciatica. He does have the previous history of a laminectomy from L4 through the sacrum with associated discectomy, as enumerated above, under the care of Dr. Mitchell.
Kahn went on to describe the diagnostic studies that were done shortly after the current accident:
MRI without gadolinium of the lumbar spine has been re-reviewed from December 20, as well as December 26 with gadolinium. These MRIs do show disc bulging at the L4-5 level causing central canal stenosis as well as a recurrent large disc herniation at the L5-S1 level.
In addition, EMG and nerve conduction study that have been performed on February 27, 2001, does reveal positive sharp waves involving the lower extremities indicative of an acute trauma and is in the appropriate time frame since the time of his accident in December, 2000. In addition, the EMG report performed by John [Y]ulo, M.D., on February 27, does state there is evidence for right S1 and left lumbosacral radiculopathy and, due to the increased amplitude of the fibrillation seen at the bilateral lumbar paraspinals, this is more indicative of an acute denervation.
[Emphasis added.]
Kahn then rendered his opinion regarding causation of plaintiff's disc herniation, making specific reference to diagnostic tests pre-dating and post-dating the current accident, and expressing his disagreement with the contrary conclusion reached by defendant's Independent Medical Evaluation (IME) examining physician:
It is my medical opinion that Mr. Bennett has sustained permanent disability as the result of a motor vehicle accident he was involved with on December 16, 2000, with a reasonable degree of medical certainty. Upon reviewing the MRIs as well as EMG, Mr. Bennett did sustain a recurrence of his disc herniation which he underwent operative intervention in 1992 as elaborated above. In addition, his EMG and nerve conduction study is most definitely indicative of acute injury secondary to the positive sharp waves noted and this is substantiated as well as by Dr. [Y]ulo, who performed the EMG and nerve conduction studies.

Although Mr. Bennett has had a previous history of low back injuries with two incidents of lumbar sprain and strain as enumerated above, as well as a disc herniation, he underwent surgical intervention for this and was asymptomatic prior to the motor vehicle accident *20 he was involved with on December 16, 2000. It is my medical opinion that Mr. Bennett did sustain a recurrence of this disc herniation at the L5-S1 level as the result of a motor vehicle accident he was involved with on December 16, 2000. Mr. Bennett will suffer from chronic low back pain to various degrees on a daily basis, depending on his activity level and his condition will most certainly deteriorate with the passage of time, due to the natural history of disc herniations with associated disc desiccation, disc space narrowing and subsequent development of spondylosis in the lumbar spine. It is unfortunate he is continuing to have this low back pain and he may require further surgical intervention in the future, as he is still symptomatic. It is my medical opinion he is permanently disabled and will not be able to return to work, performing heavy manual labor, ie., truck/tractor-trailer driver.
In addition, I have reviewed the IME report prepared December 10, 2001, by Dr. Todd Segal and I am in disagreement with his review of Mr. Bennett's MRI of December 20, 2000. Dr. Segal does state there is a moderate sized, right sided posterior disc herniation at the L5-S1 level and this is not associated with either edematous or radial tear of the adjacent annular margin to signify relative, recent occurrence of this disc abnormality. Dr. Segal stated, therefore, with a reasonable degree of medical certainty this disc herniation was a pre-existing herniation. I do disagree with this, in light of Mr. Bennett's previous history of a lumbar laminectomy with discectomy, as the natural progression and natural history of disc herniation with subsequent surgery is one of disc herniation with associated disc dessication.

It is my medical opinion that Mr. Bennett's recurrent disc herniation is a new injury and is directly related and is caused by the motor vehicle accident Mr. Bennett was involved with on December 16, 2000. Mr. Bennett has been evaluated by Dr. Joan O'Shea who did repeat the MRI of Mr. Bennett's lumbar spine. The films are not available for my personal review, although I do have an MRI report from South Jersey Radiology dated May 8, 2002. In the body of this report, it does relate there is evidence of what appears to be a disc herniation at the L5-S1 level. This does concur with Mr. Bennett's previous MRI dated December 20 and 26, 2000.
....

In addition, today's evaluation as well as the medical opinion regarding Mr. Bennett's permanent disability is based on elaborate medical records from the injuries he sustained, as enumerated above. Upon review of these medical records, it is quite easy to come to the conclusion the injuries he sustained as the result of the motor vehicle accident on December 16, 2000 are, indeed, new injuries, as he was completely resolved from his previous injuries, as enumerated above.
[Emphasis added.]
We are satisfied that Kahn's report has provided the required Polk analysis. He is a treating orthopedic physician, and he has based his opinions differentiating plaintiff's injuries on objective medical evidence pre-dating and post-dating the current accident. Thus, his opinions are supported by "objective data and discussion where the expert claims a cause-and-effect relationship between a patient's subjective complaints and a traumatic event." Polk, supra, 268 N.J.Super. at 575, 634 A.2d 135 (citing Buckelew v. Grossbard, 87 N.J. 512, 524, 435 A.2d 1150 (1981)). Kahn has provided an objective medical basis to substantiate *21 plaintiff's complaints and causally connected them to the current accident rather than to plaintiff's prior medical condition. Id. at 576, 634 A.2d 135. His report does not suffer from the infirmity we recognized in Polk, where the physician listed a series of complaints "without supporting objective corroborative medical evidence," thereby "parroting" the statutory requirements. Id. at 575, 634 A.2d 135 (citing Oswin v. Shaw, 129 N.J. 290, 320, 609 A.2d 415 (1992)).
Throughout his appellate brief, defendant presents arguments, based upon the medical records, supporting the conclusions of his IME examining physician that plaintiff's current condition pre-existed the current accident. These arguments provide the other side to a legitimate factual dispute, which will be for the jury to resolve. We are satisfied that plaintiff has met his burden of providing credible, objective, medical evidence which, when viewed most favorably to plaintiff, could lead a rational factfinder to reasonably find that plaintiff suffered a serious permanent injury as a result of the current accident. Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540, 666 A.2d 146 (1995).
Under AICRA the verbal threshold is crossed upon proof of "a permanent injury within a reasonable degree of medical probability." N.J.S.A. 39:6A-8a. Permanency means a body part or organ "has not healed to function normally and will not heal to function normally with further medical treatment." Ibid.
Under the pre-AICRA version of the verbal threshold statute, our Supreme Court established a two-part test to succeed, requiring proof of a qualifying injury and proof that the injury had a serious impact on the plaintiff's life. Oswin, supra, 129 N.J. at 318-19, 609 A.2d 415. There is some uncertainty under AICRA about the precise criteria now required to succeed. Two panels of this court have held that in addition to permanent injury a plaintiff must still prove serious life impact. James v. Torres, 354 N.J.Super. 586, 596, 808 A.2d 873 (App.Div.2002), certif. denied, 175 N.J. 547, 816 A.2d 1049 (2003); Rios v. Szivos, 354 N.J.Super. 578, 580, 808 A.2d 868 (App.Div.2002). This panel has recently adopted a formulation requiring proof of a soft tissue injury that is both permanent and serious. Serrano v. Serrano, 367 N.J.Super. 450, 460-61, 843 A.2d 358 (App.Div.2004). In that case we found it unnecessary to determine whether AICRA requires independent proof of serious life impact because the plaintiff's injuries were not the serious type required by AICRA. Ibid. We observed that proof of serious life impact could be used to prove that a soft tissue injury is serious. Id. at 461, 843 A.2d 358. The issue is now pending before our Supreme Court on appeal from a two-to-one unpublished decision by yet another panel of this court. Id. at 458-59, 843 A.2d 358.
We rest our decision on the approach we set forth in Serrano. As we have stated, applying the Brill standard, if a jury finds that plaintiff's disc herniation has been caused by the current accident, the jury can likewise reasonably find that the injury is serious and permanent. See id. at 459, 843 A.2d 358 (mentioning a herniated disc as an example of a serious and permanent injury). Such a conclusion is bolstered by plaintiff's serious life impact evidence, if believed by the jury, that he is unable to engage in his usual form of employment because of his injury. Id. at 461, 843 A.2d 358.
Although not critical to our decision, we note in passing that plaintiff's life impact evidence (alleged inability to engage in his usual form of employment) is sufficient to survive summary judgment with respect to *22 serious life impact as a separate prong under the James and Rios approach.
In making his decision, the motion judge cited the Brill standard and stated the following reasons for granting defendant's motion:
The Court has reviewed the moving papers. And, the Court, having reviewed the moving papers, as well as Oswin v. Shaw, 121 New Jersey 290, a 1992 case, Polk v. Daconceicao, 268 New Jersey Super, 568, Appellate Division, a 1993 caseand the Court's decision is as follows:
The plaintiff has failed to provide an expert opinion performing a comparative analysis to show what portions of his injuries were caused by the accident at issue or what portion of injuries are related to a prior accident. Without a comparative analysis, the conclusion that the preexistent condition has been aggravated must be deemed insufficient to overcome the verbal threshold as set forth in N.J.S.A. 39:6A(8)(a).
There are no factual disputes regarding plaintiff James Bennett's injuries and whether those injuries had substantial impact on his life. The plaintiff was involved in a prior motor vehicle accident and work related accident. However, no doctor submitted a comparative analysis providing the required causal nexus between the accident and the aggravation of the injuries.
These findings are wholly inadequate. A trial court is required to "find the facts and state its conclusions of law thereon... on every motion decided by a written order that is appealable as of right." R. 1:7-4(a). "Failure to perform that duty `constitutes a disservice to the litigants, the attorneys and the Appellate Court.'" Curtis v. Finneran, 83 N.J. 563, 569-70, 417 A.2d 15 (1980) (quoting Kenwood Assocs. v. Board of Adj. Englewood, 141 N.J.Super. 1, 4, 357 A.2d 55 (App.Div. 1976)). "Naked conclusions do not satisfy the purpose of R. 1:7-4. Rather, the trial court must state clearly its factual findings and correlate them with the relevant legal conclusions." Id. at 570, 417 A.2d 15 (citations omitted).
The motion judge's conclusory statement leaves the litigants and us uninformed of its basis. We do not know what medical reports or other evidence in the motion record he considered. We cannot tell whether he examined Kahn's June 5, 2003 report or, if he did, why it did not satisfy the Polk requirement. We do not know the meaning of the statement: "There are no factual disputes regarding plaintiff James Bennett's injuries and whether those injuries had a substantial impact on his life." This could mean, on the one hand, that a rational jury could not find a substantial impact on plaintiff's life. On the other hand, it could mean that a rational jury would most certainly find a substantial impact as a result of plaintiff's medical condition, but it would not matter because of the judge's conclusion that proof of causation by the current accident was lacking.
Where insufficient trial court findings are provided, we have the option of remanding to the trial judge for a more complete statement of reasons. We have declined to follow that course. Upon appellate review of summary judgment, we apply the same standard as the trial court, and, in effect, exercise de novo review. Prudential Property Ins. v. Boylan, 307 N.J.Super. 162, 167, 704 A.2d 597 (App. Div.1998). The issues here are legal, not factual, and we base our decision on the same evidential materials that were before the trial court on the summary judgment motion. Thus, in the interest of disposing *23 of the matter without further delay, we have chosen to decide the issue ourselves.
Reversed and remanded for trial.