**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4536-16T1

RONALD WINNIX,

    Plaintiff-Appellant/
    Cross-Respondent,

v.

SANDRA WINNIX, PICORP INC.
BALTIMORE, PICORP TRANSPORT
INC., PICORP INC., TRAC LEASE,
INC. a/k/a TRAC INTERMODAL,

    Defendants-Respondents,

and

BINYAMIN T. SALIS,

    Defendant-Respondent/
    Cross-Appellant,

and

DANQUAH-TABBI VENTURES, LLC,

    Defendant.

_____

Argued September 20, 2018 – Decided June 27, 2019

Before Judges Fuentes, Accurso and Vernoia.

On appeal from the Superior Court of New Jersey, Law Division, Mercer County, Docket No. L-1486-14.

Michael J. Confusione argued the cause for appellant/cross-respondent (Hegge and Confusione, LLC, attorneys; Michael J. Confusione, of counsel and on the briefs).

Richard C. Bryan argued the cause for respondent/cross-appellant Binyamin T. Salis (Cipriani & Werner, PC, attorneys; Richard C. Bryan, on the briefs).

Wendy Allyson Reek argued the cause for respondent Sandra L. Winnix (Leary, Bride, Mergner & Bongiovanni, PA, attorneys; Wendy Allyson Reek, on the brief).

Colleen M. Crocker argued the cause for respondents Picorp Inc., Baltimore, Picorp Transport, Inc., and Picorp, Inc., TRAC Lease, Inc., a/k/a TRAC Intermodal (Zirulnik, Sherlock & DeMille, attorneys; Colleen M. Crocker, on the brief).

PER CURIAM

In this automobile accident case, plaintiff Ronald Winnix appeals from the order of the Law Division granting defendants Sandra Winnix's, Binyamin Salis's, and Picorp Inc.'s motions for summary judgment and dismissing his complaint with prejudice. Viewing the record in the light most favorable to plaintiff as required by Rule 4:46-2(c), the motion judge found plaintiff did not present competent evidence showing defendant Salis was negligent in the

manner he operated the tractor trailer truck. We agree and affirm. We thus conclude that the absence of evidence showing Salis was legally responsible for this accident obviates the need to decide the remaining arguments raised by the parties in this appeal.[1]

I

This automobile accident occurred on July 6, 2012. At that time, plaintiff and defendant Sandra[2] Winnix, both forty-two years old, were married and resided in Greensboro, North Carolina with their two children, a boy age sixteen and a girl age fourteen. At his deposition, plaintiff testified that on July 3, 2012, Sandra suggested the family spend the Fourth of July holiday in Brooklyn, New York. According to plaintiff, the trip was totally unplanned.

---

[1] Defendant Binyamin T. Salis filed a cross-appeal arguing the motion judge erred in denying his first summary judgment motion. A cross-appeal is not necessary. "[I]t is the judgment that is the focus of the appeal." Stone v. Old Bridge, 111 N.J. 110, 115 n.2 (1988). As respondents, defendants can raise alternative arguments that were presented before the motion judge in support of the court's final order, including arguments the judge either rejected or did not address. State v. Eldakroury, 439 N.J. Super. 304, 307 n.2 (App. Div. 2015); see also Lippman v. Ethicon, Inc., 432 N.J. Super. 378, 381 n.1 (App. Div. 2013); Chimes v. Oritani Motor Hotel, Inc., 195 N.J. Super. 435, 443 (App. Div. 1984).

[2] Because plaintiff and defendant have the same last name, we will refer to defendant Sandra Winnix by her first name from this point forward. We do not intend any disrespect.

3

Q. We heard some testimony earlier today about the trip to New York, right?

A. Yes, sir.

Q. And is that something that was your wife's idea to do?

A. Yes, sir.

Q. Alright. And was that something that was decided on at the last minute?

A. At the drop of a dime.

Plaintiff telephoned his aunt Estelle, who resided in New York, and told her his wife wanted to leave that same night to spend the Fourth of July holiday in New York City. Plaintiff testified that based on what Sandra told him, he was concerned about the condition of the minivan's rear tire.

Q. Okay. And what did you know was wrong with that tire?

A. I'm just going by what she told me, she said she had needed a tire.

Q. Okay. And she just said needed a tire, single tire?

A. Yes.

Q. Alright. And did you go out and take a look at that tire before you took it over to 24/7?

A. I can't remember.

4

Q. Alright. Did you hear her complain before this that the tire was losing air or there were any problem[s]?

A. No. She just said she knows that she needed a tire back there.

Plaintiff took the minivan to the "24/7 Tires" at approximately eleven o'clock that night and returned about thirty to forty minutes later. He did not ask the service staff at 24/7 Tires to check every tire on the minivan, only the one Sandra told him may need to be repaired. He purchased a used tire to replace the tire that Sandra told him was leaking air. Although plaintiff did not remember the exact price he paid for this used tire, he estimated it was "between 35 and $45. . . [.] The entire family was on their way to New York "within an hour or two of the tire being put on the back of the [minivan] . . . [.]" The drive from Greensboro to Brooklyn took approximately nine hours.

According to plaintiff, his wife purchased the Kia Sedona minivan new in 2005. Plaintiff did all the driving on the way to New York. When the family departed Greensboro, Sandra told plaintiff the minivan "needed a tire back there." At her deposition, Sandra testified that they did not need to put air in the rear tire during the entire nine-hour drive from Greensboro to Brooklyn.

The family's Fourth of July excursion to New York ended on July 6, 2012. Sandra drove the minivan on the return trip to North Carolina. Plaintiff was

5

seated in the front passenger seat; the children were seated in the back passenger area.  After they left Brooklyn, Sandra drove south on the New Jersey Turnpike for an estimated three hours before the accident occurred.  According to the New Jersey State Trooper who responded to the scene, the accident occurred on the southbound lane near Exit 2 of the New Jersey Turnpike, which is located in Woolwich Township, Gloucester County.  Sandra testified she was traveling "about" sixty-five miles per hour.  The weather was sunny and clear.  The traffic fluctuated from heavy to light, and "generally lessen[ed] the further south on the Turnpike."

Sandra testified that plaintiff and she heard a "thumping noise" as the vehicle travelled on the right side of the Turnpike.  After a minute or two, the noise became louder and the minivan began to vibrate.  The noise was coming from the back of the vehicle.  They agreed to stop on the shoulder of the road.  As soon as the vehicle stopped, Sandra, plaintiff, and their then sixteen-year-old son stepped out to take a look at the rear of the vehicle.  All three specifically looked to determine if there were any signs of damage to the vehicle's four tires.  Sandra was questioned about the thoroughness of this visual inspection:

> Q. And tell me how you looked at the tires, how did you inspect it [sic]?
>
> A. We just walked around and looked at them.

6

Q. Okay.

A. And just looked, that was it.

Q. Were you able to observe either of the two rear tires losing air?

A. No.

Q. Did anybody get down on their hands and knees and kind of look underneath the back of the car?

A. No.

The visual inspection took "about two minutes." Unable to discover the cause of the problem, Sandra, plaintiff, and their then sixteen-year-old son returned to the minivan and agreed to stop at the next exit. After waiting "a few minutes" to let some cars go by, Sandra began to drive slowly on the shoulder of the road to determine whether the noise problem remained. According to Sandra, everyone agreed the noise was gone. As a cautionary measure, Sandra testified she turned on the vehicle's hazard lights to "make sure that when I pulled back into the next exit . . . people would see my car."

When Sandra drove the minivan into the outside lane of traffic that was next to her, she was able to see the traffic coming behind her. She testified that when she pulled out into the lane of traffic, she did so in a manner that left enough time for her to safely do so.

7

Q. Can you estimate how far away from you the tractor trailer was at that point in time when you pulled out?

A. I can't tell you in feet, because I wouldn't know. No, I cannot.

Q. Okay. But whatever distance it was, you felt that it was safe to do so?

A. Yes.

Q. And you wouldn't pull out in front of a tractor trailer in a lane; correct?

A. No.

Q. And why not?

A. Because it would hit me.

Q. Okay. Now when you got back onto the highway were you able to see how far down the next exit was?

A. I don't remember.

Q. Did you have the impression or the understanding it wasn't that far away?

A. I don't know, to be honest.

Q. Can you estimate for me how long after you pulled back onto the highway that the accident took place?

A. About a minute after. . . . Maybe two.

          . . . .

Q. Was there a point in time prior to the accident occurring that you moved over to the inside lane or the left lane of [the] New Jersey Turnpike before the accident happened?

A. No, I stayed in that lane, the far lane.

. . . .

Q. Alright. And when you pulled out into the right lane did you accelerate to get up to highway speed?

A. Yes.

Q. Did you hear the noise again?

A. No. Because then the tire had blew. I picked up a little bit of speed, and then the tire blew, hit the guardrail, spun back out in traffic, and I was knocked out.

Q. Okay. So you hadn't got up to 65 miles an hour –

A. No.

Q. – before the accident took place?

A. No.

Defendant Binyamin T, Salis was the driver of the tractor trailer that struck the minivan. He was a licensed commercial driver with over twelve years of experience. At the time of the accident, the truck he was driving was not equipped with what is commonly referred to as a "black box," a device that tracks and records the speed of the vehicle in the event of an accident and other

data related to its mechanical operations. Salis testified it is his responsibility to maintain the truck in good working order.

Salis provided the following account of how the accident occurred:

> On that day I was coming from north heading south. And right when I passed, like, the Exit 2 sign I saw the driver of the van. They were on the shoulder, somebody that I could see coming out getting into their car. And I kind of slowed down the speed I'm doing, like forty.
>
> So they started driving. And they in front of me and cut to the left. So we all driving. I was doing like forty. I don't know whatever speed they are doing. Because I caught them. And I then see smoke, you know. And then they started spinning. So, started spinning, I tried to avoid them, you know. And then I hit, my truck. And we just kind of -- you know, to -- so crazy over there that I don't --
>
>         . . . .
>
> Q. . . . Let's try to go back. How far were you when you saw them on the side of the road, how far away were you from them?
>
> A. I could say maybe a quarter of a mile, something like that.
>
>         . . . .
>
> Q. . . . Now, when you saw them were they on the right shoulder of the road or closer to the center lane, or the center lane shoulder of the road?
>
> A. The right shoulder.

10

. . . .

Q. What lane were you traveling in?

A. I'm on the right lane.

. . . .

Q. And then what happened after you are in the right lane, you see them get back into the car? Tell me what happens next?

. . . .

A. Then the car moved. They start the car and get in front of me and then swing to the left lane. So there we were -- I'm at the point -- by the time they get to the left lane I'm kind of closer to them. And then their tire blows off. I didn't know at that point that it was a tire, I just see a smoke. And then they start spinning. You know, that spinning, they hit me. I swing to my right and hit the rail.

## II

On July 7, 2014, plaintiff Ronald Winnix filed an amended complaint against his wife Sandra Winnix, Binyamin Salis, Picorp Inc. Baltimore, Picorp Transport Inc., Picorp Inc., Trac Lease, Inc., and Danquah-Tabbi Ventures, LLC, seeking compensatory damages for injuries he suffered related to this automobile accident. After joinder of issue and extensive discovery, the court granted Salis's motion for summary judgment. Applying the standard codified in Rule 4:46-2(c) as explained by the Court in Brill v. Guardian Life Ins. Co. of

11

Am., 142 N.J. 520, 540 (1995), the motion judge found the record devoid of any evidence that Salis was civilly liable for the accident. The judge found plaintiff did not present any evidence that Salis drove his tractor trailer in a negligent manner. After conducting a de novo review of the record developed before the Law Division, Templo Fuente De Vida Corp. v. Nat'l Union Fire Ins. Co., 224 N.J. 189, 199 (2016), we agree plaintiff failed to establish Salis was negligent as a matter of law.

Our State's tort jurisprudence is predicated upon the fundamental principle that "ordinarily negligence must be proved and will never be presumed, that indeed there is a presumption against it, and that the burden of proving negligence is on the plaintiff." Buckelew v. Grossbard, 87 N.J. 512, 525 (1981). As this court explained more than sixty-six years ago:

> As a legal concept negligence is not an imaginative notion, a creature of mere surmise or conjecture; it denotes elements of factuality from which a lack of due care can be rationally deduced. It is not presumed that every injurious mishap that one encounters is necessarily attributable to the negligence of another. The factual pedestal stabilizing the logical inference of negligence must be established by some competent proof.
>
> [Overby v. Union Laundry Co., 28 N.J. Super. 100, 104 (App. Div. 1953).]

Here, viewing the evidence in the light most favorable to plaintiff, Rule 4:46-2(c), there is no rational basis to deduce that the accident was caused by Salis's negligent operation of his tractor trailer truck. The uncontested evidence established Sandra was driving the minivan on the New Jersey Turnpike with its hazard lights activated when its rear tire blew, causing it to spin out of control and crash into Salis's tractor trailer truck. Salis was approximately one quarter of a mile away when he first saw the minivan. He immediately reduced his speed to forty miles per hour as a precautionary measure. By Sandra's own account, the minivan "picked up a little bit of speed, and then the tire blew, hit the guardrail, [and] spun back out in traffic[.]" As soon as Salis saw smoke coming from the minivan, he maneuvered his truck to avoid colliding with it. No rational jury can find Salis deviated from the standard of conduct a reasonable driver of a commercial vehicle would take under these circumstances.

The record also shows Ronald and Sandra Winnix assumed a significant risk when they impromptu decided to embark on a nine-hour road trip with their two teenaged children, knowing one of the minivan's rear tires had been replaced with a used tire of unknown quality. After she heard a noise and felt a vibration coming from the rear of the vehicle, Sandra testified she immediately pulled

A-4536-16T1

over and stopped the minivan on the shoulder of the Turnpike. The two-minute visual inspection of the vehicle performed on the side of the road by the two adults and their sixteen-year-old son was not capable of revealing any latent defects in the tires. Sandra's decision to continue to drive the minivan under these circumstances was the dispositive factor that precipitated this accident.

Based on these uncontested facts, we discern no legal or factual basis to overturn the Law Division's order granting defendants' motion for summary judgment and dismissing plaintiff's complaint with prejudice.

Affirmed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION